ALBANY,
Dec. 1828.

Malin
v.
Malin.

For reversal,
17—For affirmance, 7.

---

DAVID H. MALIN and others, *appellants,* and RACHEL MALIN and others, *respondents.*

The declarations of a trustee are competent evidence for the purpose of establishing a *resulting trust.* Such trust is not within the statute of frauds, and may be proved by parol, although it is a dangerous species of evidence, and the payment of the money by the *cestuis que trust,* ought to be clearly and satisfactorily established. Proof of the declarations or confessions of parties, is of a most unsatisfactory nature, unless corroborated by circumstances. A resulting trust is a trust raised by operation of law, in favor of a person who advances the purchase money or consideration for an estate, the conveyance for which is taken in the name of another; and it will attach as well to a gift as a purchase of lands included in a grant in which a valuable consideration is expressed to have been received. A declaration of trust need not be made at the time of the purchase; it may be at any subsequent period. A party holding a contract for the conveyance of lands, has a devisable interest in such lands, and a devisee of such interest may transmit it to another by will. An immaterial alteration in a will, if made by a stranger, will not destroy it. The testimony of a witness,

ALBANY,
Dec. 1828.

Malin
v.
Malin.

who has the means of knowledge, whether a written instrument has been altered or not, outweighs the evidence of a dozen witnesses who speak only from an inspection of the paper.

The agreement of a party to form a settlement, and commence improvements on a tract of wild, uncultivated lands, is a consideration moving from such party, equivalent to the payment of a pecuniary consideration ; and where, in consequence of such agreement, a tract of land is conveyed to a third person, for the benefit of the party making the agreement, such consideration is sufficient as the basis of a resulting trust. Per STEBBINS, senator.

A specific devise to one person forms an exception to a general devise to another, contained in a previous clause of the same will. Per STEBBINS and OLIVER, senators.

APPEAL from chancery. Jemima Wilkinson, in 1776, became the founder or head of a sect called " Universal Friends." She was known among her followers by the name of " the Universal Friend," and answered to, and acknowledged no other name. In 1791, she removed from Pennsylvania, with a number of followers, into the state of New-York, and took up her residence in the county of Ontario. Several of her adherents had preceded her in locating themselves in the town of Benton, adjacent to the Seneca Lake, and others followed her. There prevailed among her people an opinion that she could not hold land or make any contracts, or, as expressed by themselves, " by the inviolable order and principles of the society, no estate or temporalities could be vested in the Universal Friend ;" and all contracts relating to property were made in the name of some one of her followers, for her benefit, and the relief and maintenance of the poor and indigent of the society. For the two first years after the establishment of the society in Ontaria county, Sarah Richards, one of her followers, was her trustee or steward. Sarah Richards died in 1793, and was succeeded by Rachel Malin, one of the respondents in this cause, as trustee, who continued to act in that character to the time when the proofs in the cause in chancery were taken.

On the 5th January, 1792, Benedict Robinson, by deed, conveyed to Sarah Richards the north halves of lots Nos. 22 and 27, and lots Nos. 23, 24, 25 and 26, in township number seven, in the second range of towns in Phelps' and Gorham's purchase, in the county of Ontario, containing 1400 acres,

for the consideration expressed in the deed, of *forty pounds.*
On the 2d May, 1793, Thomas Hathaway conveyed by deed
to *Sarah Richards,* the south halves of Nos. 22 and 27, and
the north halves of lots Nos. 21 and 28; and on the 1st June,
1793, also conveyed to her by deed lot No. 47.   Immediately
after the purchases made by Sarah Richards, improvements
were commenced upon the lands by the followers of Jemima
Wilkinson, by whom they were considered and called the
"Friend's" lands.   They were cultivated and improved, or
otherwise disposed of, under her directions, and the proceeds
of the property applied to the support of " The Friend" and
her family, agreeably to her directions, and not to the personal
benefit or emolument of Sarah Richards.

 *Sarah Richards* died on the 29th December, 1793, leaving
a last will and testament, bearing date the 16th of the same
month, which contains the following clauses : " *Item,* 4thly.
I give and bequeath to my dear and only daughter, Eliza
Richards, all my property in Watertown, Litchfield county,
in the state of Connecticut.   All the lands deeded me by
Benedict Robinson, excepting one thousand acres of land, I
deed to Rachel Malin ; also all the receipts that I now hold
for lands or the avails of them ; also, as to personal property,
I give her one sorrel mare and colt, one pied cow, and four
sheep.   *Item* 6thly.   I give and bequeath to my good and
trusty friend, Rachel Malin, one thousand acres of land ly-
ing and situate in number seven, in the second range of town-
ships of the Massachusetts pre-emption, in the county of On-
tario and state of New-York ; the said thousand acres to be
taken off from the south end of that I now own in the town,
deeded to me by Benedict Robinson ; also all that tract of
land deeded to me by Thomas Hathaway, bearing date the se-
cond day of the fifth month, in the year of our Lord one thou-
sand seven hundred and ninety three, witnessed by William
Carter and Abel Botsford ; also all the lands that has or may
arise from Asa Richard's estate, deceased ; also one sorrel
horse, and all the rest of my stock, together with all the
rest of my farming utensils."   Richard Malin and Richard
Smith were constituted executors of this will.   It appeared,
that one Asa Richards had paid Benedict Robinson £56, for

# 628

which he held Robinson's receipt, in which Robinson engaged to convey to him lands in township No. seven, without reference to any particular lot. Asa Richards died, having by his last will and testament, bearing date the 21st April, 1792, devised and bequeathed unto Sarah Richards, all his estate, real and personal, as lands, chattels, and wearing apparel, making her sole heir of every individual article or thing belonging, or in any wise appertaining to him, and constituted her sole executrix.

Benedict Robinson and Thomas Hathaway were tenants in common of the whole of township No. *seven*, containing 24,661 acres of land. They released their interest in the township to one William Carter, the deed from Robinson to him bearing date the 28th June, 1793, and the deed from Hathaway bearing date the 4th August, 1795, each reserving to himself a quantity of the land, and requiring Carter to fulfil their contracts made in relation to the sale of lands. On the 14th July, 1795, William Carter, in consideration of $124, recited in the deed of conveyance to have been paid by *Sarah Richards* to Benedict Robinson, released in fee to *Rachel Malin*, executrix of the will of Sarah Richards, lots Nos. 50, 51 and 52, of township No. seven, containing 960 acres ; and on the same day, in consideration of $140 received by Robinson of Asa Richards, released in fee to *Rachel Malin*, lots No. 45 and 46, containing 640 acres ; and on the 14th August, in the same year, Carter, in consideration of $350, expressed in the conveyance to be money of Jemima Wilkinson, or " The Public Universal Friend," paid to him by Rachel Malin, released in fee to the said Rachel, lots Nos. 21, 22, 23, 24, 25, 26, 27, 28, 45, 46, 47, 50, 51, and 52, containing 4160 acres of land.

Eliza Richards, the daughter of Sarah Richards, was left by her mother, under the care of Jemima Wilkinson, from whom she eloped, and intermarried with Enoch Malin about the year 1796. Enoch Malin and his wife laid claim to the lands conveyed to *Sarah Richards*, and sold several parcels of the same. In June, 1811, *Rachel Malin*, who had succeeded Sarah Richards as the trustee and steward of " The Universal Friend," alleging that Jemima Wilkinson, being

restrained by her profession and the ties of conscience, from becoming a party to any suit or proceeding at law, filed a bill in chancery against Enoch Malin and Eliza, his wife, and against Elnathan Botsford, jun., Asahel Stone, jun. Asa Ingraham, and Truman Stone, purchasers from Enoch Malin and and Eliza, his wife, of portions of the lands in question; alleging that the purchase made by Sarah Richards from Benedict Robinson, in January, 1792, was made by her as the trustee of Jemima Wilkinson; that the consideration money was paid by Jemima Wilkinson; and that the deed of the land was executed to Sarah Richards for the benefit and use of Jemima Wilkinson, and for the support of the poor of the society of "Universal Friends," although the trust upon which the conveyance was made, was not expressed in the deed. The will of Sarah Richards was also set forth in the bill; and the complainant, Rachel Malin, alleged, that the testatrix, Sarah Richards, in and by the will, intended to constitute her, the complainant, a trustee of all the lands conveyed by Robinson to and for the same uses, that she, the testatrix, had held and received the same; and that she, the complainant, so received the said lands under the said will, and had hitherto so managed and improved the same. The sale of portions of the land to the four last named defendants was set forth, and the bill concluded by praying a subpœna requiring the defendants to answer, and for general relief.

The defendants, by their answer, deny the trust set up in the bill, and allege that 1000 acres, part of the 1400 acres conveyed by Robinson to Sarah Richards, were conveyed as a gift; and that the $100 paid, were paid as the price of the remaining 400 acres. They admit, however, that Sarah Richards was one of the followers of Jemima Wilkinson, and that all the income or proceeds of the land, were expended in the society for the common benefit of all, and for the improvement and cultivation of the land. They aver that the will of Sarah Richards, since her death, has been falsely and fraudulently altered, so as to devise and bequeath to the complainant large portions of the estate of the testatrix, which, by the will as originally executed, were devised to her daughter

ALBANY,
Dec. 1823.

Malin
v.
Malin.

Eliza. They deny any trust to be created by the will of Sarah Richards. The defendant, Botsford, avers his purchase, containing 400 acres, to have been made *bona fide*, and with the approbation and consent of Jemima Wilkinson and the complainant; and the other defendants, purchasers, aver their purchases also to have been *bona fide*, and that a full and fair consideration was paid for the land conveyed to them.

In this stage of the cause, numerous witnesses were examined on the part of the complainant, to establish the trust; but as the testimony is adverted to and commented upon in the opinions pronounced on the final decision of this cause, it is deemed unnecessary to be here stated. Much evidence was also given, on the part of the defendants, to rebut the idea of a trust; and a number of witnesses were examined to prove an alteration in the will of Sarah Richards. The alteration was alleged to have been made by erasing the word "also" in the fourth *item* of the will, between the words "Connecticut" and "all," and to induce the belief that the alteration had been made by striking out the words *Item 5thly*, the succeeding *item*, which was item 5 originally, was altered to *Item 6thly*. The evidence on this subject also being commented upon in the opinions pronounced, is not here stated.

The cause was brought to a hearing on the pleadings and proofs before the late chancellor Kent, in November, 1816, who, after allowing the bill to be amended by inserting the name of Jemima Wilkinson as a party complainant, directed a feigned issue, to be tried by a jury in the county of Ontario, to ascertain, 1st, whether Jemima Wilkinson had advanced any, and what sum or sums of money, or other valuable consideration, for the lands or any part thereof, contained in the conveyance from Benedict Robinson to Sarah Richards, bearing date 5th January, 1792. 2d. Whether the will of Sarah Richards had been altered since the execution thereof by her. 3d. Whether the whole or any, and if any, what part of the land described in the conveyance from Benedict Robinson to Sarah Richards, of 5th January, 1792, passed by that conveyance. 4th. Whether the defendants were or were not bona fide purchasers, without notice of the alleged

trust. A feigned issue was prepared and noticed for trial at the Ontario circuit in June, 1817. The trial was put off on the application of Richard Malin, for want of a material witness. Previous to the August term, 1817, of the supreme court, actions of ejectment were commenced on the demise of David H. Malin and Avery Malin, children and heirs at law of Enoch Malin and Eliza, his wife, (who died previous to the October circuit) and of Elisha Williams against Mary Holmes and eleven other persons, tenants in possession of parcels of the lands in question. The tenants appeared, and together with Jemima Wilkinson and Rachel Malin, filed their bill of complaint in the court of chancery against the lessors of the plaintiff in the actions of ejectment, setting forth the several conveyances from Benedict Robinson, Thomas Hathaway and William Carter; alleging that the conveyances to Sarah Richards were made in trust for Jemima Wilkinson, and that Jemima Wilkinson paid the consideration monies, setting forth an instrument in writing, signed by Sarah Richards and Benedict Robinson, of the same date with his deed, declaring that 1200 acres, part of the 1400 acres conveyed by him, were conveyed as a present; stating the conveyances to Botsford, Stone and Ingraham, the filing of the former bill, the proceedings thereon, and the commencement of the actions of ejectment, and praying for a full answer, an injunction staying the suits at law, and general relief. Elisha Williams puts in his answer, denying, substantially, all the material allegations of the bill, and the other defendants, being infants, put in a formal answer by guardian. Issue being joined, proof was taken. On the part of the complainants were produced a register of events, or memorandum book, alleged to have been kept by *Sarah Richards*, commencing on the 13th March, 1790, and continued down to 24th October, 1793, and two letters, alleged to have been written by *Sarah Richards* to Ruth Pritchard, afterwards Ruth Spencer, furnished by Ruth Spencer, since the year 1816, who, previous to the proofs in this last cause being taken, had died. The entries in the memorandum book fully shew that the deeds executed to Sarah Richards by Benedict Robinson and Thomas Hathaway, were executed to her in

trust for "the *Universal Friend*," and that the Universal Friend paid the consideration money. The first of the letters is dated at Jerusalem, 12th of the 3d mo. 1793, and contains the following paragraph : "Dear Ruth, I will inform thee that Benedict Robinson has given the friend a deed of some land in the second seventh in the Boston pre-emption, which deed contains five lots, and the friend has made use of my name to hold it in trust for the friend." The second is also dated at Jerusalem, 3d of the 6 mo. 1793, and contains the following: "Dear Ruth, I take this opportunity to inform thee further about the situation of earthly concerns. The friend has also taken a deed of Thomas Hathaway, containing land south of that which Robison deeded to me, to hold in trust for the friend. And this deed is witnessed by William Carter and Abel Botsford." The principal part of the parol testimony taken in this last cause, on the part of the complainants, was to shew and support the verity of the memorandum book and letters, and on the part of the defendants, to impeach the same. In the month of June, 1823, Rachel Malin and Margaret Malin, with the other and former complainants, filed a bill of supplement and revivor, alleging the death of JE-MIMA WILKINSON pending the suit, and that she had left her last will and testament, by which she had devised the lands and tenements in question to Rachel Malin and Margaret Malin in fee, in trust for the maintenance and support of the poor and indigent of the society of the Universal Friends. Answers were filed, and the cause was put at issue and came to hearing upon the pleadings and proofs at the June term, 1823, before the late chancellor Kent, and by agreement of the solicitors of the respective parties, the testimony taken in the first cause, wherein Rachel Malin alone was complainant, was read on the hearing, and on the 11th July, 1823, the chancellor made the following decree :

"This cause having been brought to a hearing, &c., it is declared and adjudged that Sarah Richards, in the pleadings and proofs mentioned, was, at the time of her death, seized in fee of the lands contained in lots Nos. 21, 22, 23, 26, 27, and 28, in township number seven, in the pleadings mention-

ed, in trust for Jemima Wilkinson, in the pleadings and proofs also mentioned ; and that the complainant, Rachel Malin, at the death of the said Sarah Richards, became seized of the said lands upon the like trust, as devisee under the last will and testament of the said Sarah Richards. And it is further declared and adjudged, that the allegations in the pleadings on the part of the defendants, that the said will had been altered since the death of the said Sarah Richards, are not sufficiently and satisfactorily supported by proof ; and that if the same had been so altered, it is not shown to have been in any material part or degree, so as to alter or affect the former sense or construction thereof. Nor is there any proof or circumstances to warrant the inference and belief, that the alteration of the said will, if made as charged, was made with the knowledge, or privity, or consent of the said Jemima Wilkinson, or of the complainant, Rachel Malin, and the rights under the said will are not impaired or affected by any such alteration, if, in point of fact, any such alteration was made, subsequent to the death of the said Sarah Richards, or the making the said will by the said Sarah. And it is further declared and adjudged, that the complainant, Rachel Malin, since the death of the said Jemima Wilkinson, continued seized of the lands aforesaid, in trust for such person or persons, and for such purposes as the said Jemima Wilkinson may by her last will and testament, duly executed and delivered, have directed, devised and appointed, and in default thereof, for the lawful heirs of the said Jemima. And it is further declared and adjudged, that the complainant, Rachel Malin, was, in the lifetime of the said Jemima Wilkinson, seized of the lands contained in lots Nos. 45 and 46, in the said township number seven, in trust for her, the said Jemima, and since her death she remained seized of the said land in trust under the will, or for the lawful heirs of the said Jemima Wilkinson, as the case may be, as aforesaid ; for though it be averred that the complainant, Margaret Malin, be a devisee of the said Jemima Wilkinson for the purposes aforesaid, yet the will of the said Jemima is not sufficiently admitted, nor is it shown in proof. And it is further declared and adjudged, that the complainant, Rachel Ma-

lin, does not appear to be entitled to any other lands in the pleadings mentioned as devisee, under the will of the said Sarah Richards, and that there is not the requisite parol proof, nor any sufficient manifestation in writing, that the said Sarah Richards, at the time of her death, held any other lands in the said township number seven, in trust for the said Jemima Wilkinson as aforesaid, except it be the lands contained in lots Nos. 24, 25, and 47, in the said township number seven; and the complainant Rachel Malin, as such devisee, does not appear to be entitled to any part of the said lands contained in those lots last mentioned; and the complainant, Margaret Malin, has not sufficiently shown herself entitled thereto, under said Jemima Wilkinson, to be enabled to ask for any assistance of this court in this suit : It is thereupon ordered, adjudged and decreed, and his honor, the chancellor, by the authority of this court, doth order, adjudge and decree, that the injunction heretofore awarded in this suit be, and that the same is hereby declared to be continued and made perpetual, in respect to all and singular the lands contained in the said lots Nos. 21, 22, 23, 26, 27, 28, 45, and 46; and that in respect to any other lands than those contained in the said eight lots last mentioned in the said injunction, the said injunction be, and the same is hereby dissolved. And it is further declared and adjudged, that if any part of the lands whereof the defendants, Asahel Stone, junior, Elnathan Botsford, junior, and Truman Stone, or either of them, claim title, as set up in the answers, and mentioned and shown in and by the proofs in the cause, are contained in either of the said lots, (and which cannot certainly be discovered from the descriptions in the deeds read in evidence on the hearing,) that the said defendant, or defendants so claiming title thereto, were not bona fide purchasers thereof, without being chargeable with the notice of the said trust, and every such purchase was made subject to said trust. It is thereupon further ordered, adjudged and decreed, that the defendant or defendants aforesaid, so claiming title as aforesaid to any part of the said lots, upon due notice of this decree, and upon demand, release to the complainant, Rachel Malin, by one or more deeds, competent in the law for that

purpose, to be settled by a master, all his or their right, title and claim under their deeds or purchases, or title, in the pleadings or proofs mentioned, of, in and to the lands in the said lots contained, and to all and every part and parcel thereof. And it is further ordered, adjudged and decreed, that no costs in this suit be charged by either party against the other."

On the 4th August, 1823, the complainants presented to Chancellor SANFORD a petition for a re-hearing, on the ground that, by some oversight, the will of Jemima Wilkinson had been omitted to be produced on the hearing, although its due execution had been conceded by the defendants; in consequence whereof, the decree, in some of its provisions, was different from what it otherwise would have been. On the 2d September, 1823, the cause being open for the purpose of amending the decree, the chancellor made the following decree :

"It appearing to the chancellor, by the terms of the decretal order entered in the cause on the 11th day of July last, that as to lots Nos. 24, 25 and 47, in township number seven, of Phelps' and Gorham's purchase, parts of the premises in question, Sarah Richards, deceased, named in said order or decree, was in her lifetime seized of said lots in trust for Jemima Wilkinson, deceased, and that the omission to award said lots to Rachel Malin and Margaret Malin, arose from a misapprehension as to the said Rachel and Margaret's right to claim said lands as representatives, or in behalf of the said Jemima. And it appearing from the pleadings in the suit in which the said decree was had, in which suitthe said Jemima was a party complainant, that the said Rachel Malin was alleged and admitted by the said Jemima to be the trustee of the said Jemima of all her lands in the said township, and that a principal object of the said suit was, to obtain the title to the lands in question to be invested in said Rachel, and the fact of the devise of said lots of land by the same Jemima Wilkinson to the said Rachel and Margaret, not being questioned or disputed between the parties—It is ordered, adjudged and decreed, that the said injunction ordered to be continued and made perpetual in and by the said decretal order, be extended to include the said lots Nos. 24,

25 and 47, in like manner as the other lots of land awarded to said Rachel Malin, in and by such decree. And further, that the lots of land be included and contained in the deed or deeds of release, which Asahel Stone, junior, Elnathan Botsford, junior, and Truman Stone, defendants, are directed and required, in and by said decree, to execute to Rachel Malin, the complainant."

From which two decrees the defendants appealed; and the cause now came on to be argued in this court. No other reasons were read for the decrees than those contained in the same—the reporter understanding that no formal opinions were delivered by either of the chancellors.

*E. Williams,* for appellants. Independent of the testimony of the followers of Jemima Wilkinson, there is no evidence whatever to support the resulting trust set up by the respondents. The testimony of those witnesses ought not to be taken into consideration in determining the rights of the parties, on account of their faith, their fanaticism, and their interest. They believed they were testifying in a controversy between their god and a mortal; and can it be supposed they believed they sinned when they obeyed the mandates of their deity, uttered not from Sinai, but from the mouth of their god? It was a tenet of their faith, that the head and founder of their sect could not commit sin, and also that she could pardon sin. What reliance, therefore, can be placed on their testimony, given under her special directions? They also are directly interested. The bill states that the purchase in question was made not only for the use of " the Universal Friend," but for the relief and maintenance of the poor and indigent of the society; and the witnesses, when they testified, fully believed that when Jemima Wilkinson should be translated or removed from them, the property would be for their use.

Twelve hundred of the 1400 acres conveyed by Benedict Robinson to Sarah Richards, cannot be affected by the claim of a resulting trust, to uphold which there must be a purchase and a valuable consideration paid, which cannot be pretended as to the 1200 acres. That quantity of the land was a *gift* to Sarah Richards—not to Jemima Wilkinson.

There was no valuable consideration paid for it, and consequently *quoad hoc*, there can be no resulting trust.

The will of Sarah Richards, under which the respondents claim a part of the premises in question, was forged by alteration. It has been said, that if there was an alteration, it was in an immaterial part, but that does not help the respondents, for the alteration must have been made by Jemima Wilkinson or Rachel Malin, or by their direction; and the rule is, that if the party in interest alters a deed, although it be in words *not material*, yet the deed is void. (11 *Co*. 26, *Pigot's case*. 15 *Johns. R*. 297. *Shep. Touch*. 66, 68.) In the case of *Jackson, ex dem. Malin* v. *Malin*, (15 *Johns. R*. 293,) the question of the alteration of this will was submitted to a jury, who found by their verdict that the will had been altered *by some interested person*; but because such finding did not necessarily designate *Rachel Malin*, or her under whom she claimed, the supreme court granted a new trial. Before such trial could be had, the defendant obtained an injunction staying that as well as the new suits. For this cause alone, the decree of the chancellor should be reversed; for if the heir of Sarah Richards, who brought that suit, was entitled to the property under a resulting trust, as she then claimed, her remedy was at law, and the court of chancery had no right to interfere.

To raise a resulting trust, strict proof is required, and the payment of the money at the time of the purchase is indispensable, as subsequent payment will not create the trust. (2 *Johns. Ch. R*. 409. 5 *Johns. Ch. R*. 19. 2 *Atk*. 71. 6 *Cowen*, 726.) Where such a trust is set up, it should be asserted in a reasonable time, on account of the difficulty of ascertaining facts resting in memory. (1 *Vern*. 296. 4 *Brown's Ch. R*. 258.) Here, 20 years had elapsed before this claim was made. There is a perfect resulting trust established in favor of the appellants as to the lots No. 45 and 46, for which a conveyance was taken confessedly on a consideration paid by Asa Richards, who had devised all his estate, real and personal, to Sarah Richards, who, by her will, gave all the receipts for lands she held to her daughter Eliza, the ancester of two of the appellants.

If a resulting trust is not established in favor of Jemima Wilkinson, then Rachel Malin, her devisee, is entitled, under the will of Sarah Richards, to only a life estate, as there are no words of perpetuity in the devise to her.

*A. Van Vechten,* for respondents. A resulting trust being a trust arising by. implication or construction of law, is expressly excepted from the operation of the statute of frauds; and to constitute such trust, it is not necessary that there should be a payment of money—any consideration moving from the *cestui que trust* is sufficient. (*Saunders on Uses,* 180. 2 *Atk.* 150, 151. 1 *Vesey, sen.* 92. 1 *Vernon,* 108, 276, 296, 366. 1 *Vesey, jun.* 42, 270. 10 *Vesey,* 360. 15 *Vesey,* 43. 1 *Johns. Ch. R.* 582. 2 *Johns. Ch. R.* 405.) Courts exercise great liberality in favor of·resulting trusts. (*Cuyler and others v. Bradt and others,* 2 *Caines' Cases in Error,* 326.) Where such trust is set up, the equity may be rebutted. There is therefore no danger of injustice, as· he who has the superior equity will be preferred. Where a trust is acknowledged by a written instrument, whether made before or after the acquisition of the real estate, it comes not within the mischief of the statute of frauds. (3 *Vesey jun.* 696.)

The will of Sarah Richards is conclusive, devising the property to Rachel Malin. The evidence of its alteration is not sufficient: at all events, the question is left in doubt, and there is no proof that the alteration, if any, was made by or with the knowledge of the persons interested in the estate. Supposing the will set aside, the rights of the respondents are not affected, if Sarah Richards was the trustee of Jemima Wilkinson; dying intestate, her heirs at law would hold the property subject to the trust. But the devise of the estate to Rachel Malin, who acknowledges that she accepted and received the property upon the same trusts upon which it had been holden by the testatrix, was a valid devise. (*Saunders on Wills,* 192. 1 *Equity Abridged,* 384. 2 *P. Wms.* 200, 201. 1 *Barnardiston,* 303. 2 *Atk.* 119. 1 *Ch. Cases,* 124. 3 *Vesey, jun.,* 341. 2 *Johns. Ch. R.* 441. 2 *Ch. Cases,* 63, 78. 1 *Brown's Ch. C.* 72. *Ambler,* 518. 1 *Madd. Ch.* 362, 3.)

As to the objection that there can be no resulting trust as to the 1200 acres which were a gift; if a gift, it was a gift to Jemima Wilkinson, not to Sarah Richards; and equity will enforce it. The land was contained in a grant expressing the receipt of a valuable consideration; and though the sum received, might be an inadequate compensation for the whole quantity conveyed, it is sufficient as the basis of a resulting trust. It is not necessary to shew a payment of money; any other valuable and beneficial consideration is sufficient. Here the inducement to the conveyance of that portion of the land called a gift, was the formation of a settlement, and the commencement of improvements upon a large tract of wild lands. The appellants have no right to complain, that the injunction prevented a second trial of the action, in which the jury had found that the will of Sarah Richards had been altered. If they were entitled to proceed in that action, they should have applied for a modification of the decree. Nor can it be insisted that Jemima Wilkinson was an impostor, and her adherents fanatics and not entitled to belief, on the grounds of their peculiar tenets and interest in the subject matter of controversy. If interested, the appellants should have applied in the court below for a suppression of their testimony; and neither the pleadings or proofs shew what were the creed or principles of this sect. There is nothing, therefore, enabling this court to say, that they held dogmas which rendered them incompetent witnesses, and which would justify a court to reject their testimony.

SUTHERLAND, Justice of the Supreme Court. The original bill in this cause, was filed in June, 1811, by Rachel Malin, complainant, against Enoch Malin and Eliza, his wife, Elnathan Botsford, jun., Asahel Stone, jun., Asa Ingraham and Truman Stone, defendants. It sets forth substantially, that a religious society or association was formed and established at Jerusalem, in the county of Ontario, by Jemima Wilkinson, denominated the society of Universal Friends, of which the said Jemima was the head, and was known by the appellation of the Universal Friend; that, for the support of herself, and the poor and indigent of said society, the said Jemima, on the 5th day of January,

ALBANY,
Dec. 1828.

Malin
v.
Malin.

1792, purchased from one Benedict Robinson the north half of lots No. 22 and 27, and lots No. 23, 24, 25 and 26, all in the town of Jerusalem, in township No. 7, in the second range of townships in Phelps and Gorham's purchase, in the county of Ontario, containing, in the aggregate, 1400 acres, for which the said Jemima paid the said Robinson, in h and, the sum of $100; that, according to the principles of said society, no estate or temporalities could be vested in the said Jemima; she therefore nominated Sarah Richards, then one of her followers, as the trustee to receive the title of the said lands; and that the said Robinson, accordingly, at the sole instance of the said Jemima, and for her benefit and use, and the support of the poor of the said society, and upon the consideration aforesaid, did, on the said 5th day of January, 1792, convey the said lots, in fee simple, to the said Sarah Richards, without expressing in said conveyance any trust whatever; that although the said conveyance was absolute to the said Sarah Richards, yet she at all times acknowledged said trust, and held and managed the said lands for the use of the said Jemima, and faithfully applied the proceeds thereof to her support, and that of her indigent followers; that the said Sarah Richards died, on or about the 29th of December, 1793, having first made her last will and testament, in proper form for passing real estate. The will is set out in the bill. It gives to the complainant *Rachel-Malin*, 1000 acres of the land which Benedict Robinson had conveyed to the testatrix; also a tract of land which Thomas Hathaway, on the 2d day of May, 1793, had conveyed to her, by a deed witnessed by William Carter and Abel Botsford; also all the land to which the testatrix was entitled from the estate of Asa Richards, deceased.

The bill alleges, that the testatrix, *Sarah Richards*, intended by her said will to constitute the complainant, Rachel Malin, a trustee of all the said lands so devised to her, for the same uses for which she, the testatrix, had received and held the same; and that the complainant so received the said lands under the said will, and has so managed and improved them.

The bill then alleges, that Benedict Robinson had title only to a moiety of the lands described in his deed to *Sarah Richards*, and that the complainant, Rachel Malin, after the death of the said Sarah Richards, to wit, on the 14th day of August, 1795, purchased and procured a conveyance of the other moiety of said lands, from William Carter, of the city of Albany, for the consideration of $350; that Eliza Richards, now Eliza Malin, one of the defendants, the daughter and only child of Sarah Richards, was left by her mother under the care and protection of the *Universal Friend;* that she continued to reside with her for about three years, when, without the consent or approbation of the Universal Friend, she left her protection and intermarried with Enoch Malin, another of the defendants; that the said Enoch Malin and Eliza, his wife, although they well knew the trust upon which Sarah Richards, the mother of the said Eliza, held the said lands, relying on the loose and imperfect manner in which said trust was created, and upon some defect supposed to exist in said Sarah's will, have laid claim to said lands, or some part thereof, and for some trifling consideration, have sold and conveyed 600 acres thereof, in certain proportions, to the other defendants mentioned in the bill, who have entered upon and improved the same, and concludes with a prayer of general relief.

The answer denies that *Jemima Wilkinson* made the purchase of the lots mentioned in the bill from Benedict Robinson, or that she paid the sum of $100, or any other sum, as the price or consideration therefor : on the contrary, the defendants aver that the said consideration money was paid by Sarah Richards. They deny that Sarah Richards was constituted or appointed the trustee of the said Jemima, to receive said conveyance ; and they allege that $100 was the full price or value of 400 acres of said land, and not of the whole 1400 acres ; and that 1000 acres of said land were presented or given by said Robinson to said Sarah Richards. They deny that any trust in relation to said lands was created for the benefit of said Jemima, or that Sarah Richards ever acknowledged such trust.

They admit the death of Sarah Richards as stated in the bill, and also the making of her will, but they aver that after said will had been proved before the surrogate of the county of Ontario, it was falsely and fraudulently altered and erased, so as to change the sense and meaning of the testatrix, and so as to devise and bequeath unto the complainant, *Rachel Malin,* large portions of the estate of the testatrix, which by the will, as it was originally executed, were devised to her daughter, Eliza Richards, now the defendant, Eliza Malin.

They deny that it was the intention of Sarah Richards to constitute the complainant trustee for any person or purpose whatever, not expressed in said will. They deny that Robinson had title to only a moiety of the lands conveyed by him to Sarah Richards; on the contrary, they aver that he was seized in fee of the whole of said land, and conveyed a good title thereto to the said Richards, although they admit that the complainant may have obtained a quit-claim or release from William Carter of all his claim to or interest in the premises.

The defendants, *Enoch Malin and Eliza his wife,* deny that they had any knowledge of the trust stated in complainant's bill, nor do they believe that any such existed.

They deny that Sarah Richards had no real estate in this state; on the contrary, they aver that she died seized not only of the before mentioned 1400 acres, but of other lots in the same township, the title whereof she derived from Thomas Hathaway; and also of an equitable interest in other lots in said township, purchased with her money, and the money of one *Asa Richards,* to which she became entitled as legatee or devisee of said Asa, and for which said last mentioned lands, the answer alleges, deeds have, since the death of said Sarah Richards, been given to the complainant upon surrendering certain receipts, which, by the will of said Sarah, before its alteration, were given to the said Eliza Malin; and if the said complainant claims those receipts, or the lands conveyed on the surrender of them, it must be under the forged alteration of the will. The other defendants deny all

ALBANY,
Dec. 1828.

Malin
v.
Malin.

knowledge of any trust in relation to said lands at the time when they purchased portions of them, and all belief of the existence of any such trust.

They deny that Enoch Malin and his wife conveyed 600 acres of said land for a *trifling consideration;* on the contrary, they aver that the said Enoch and his wife did, in August, 1799, by indenture of bargain and sale, with full covenant, convey 400 acres or said premises to Benajah Botsford and Elnathan Botsford, jun. for the consideration of $1200, paid by the grantees to the grantors, and which they aver was a full and fair price for the same. That they immediately entered upon said lands, which were then wild and uncultivated ; have since cleared and improved the same, and expended large sums of money thereon. That before the said Botsfords purchased said lands, they applied to Jemima Wilkinson and Rachel Malin, and apprised them of their intention to purchase ; that they made no objections thereto, but consented to and approved of the same.

They aver that the said Enoch and Eliza, by a similar conveyance, sold 50 acres more of said land to Asahel Stone, jun. for $200, and other 62 1-2 acres to Asa Ingraham for $250. To this answer the complainant, Rachel Malin, filed a general replication. Upon the issue thus joined, witnesses were duly examined, and the cause was brought to a hearing before Chancellor Kent, in Nov. 1816, when he ordered that the bill should be amended by making Jemima *Wilkinson* a party complainant, and that a feigned issue should be made up to try, 1st. Whether any part of the consideration for the lands conveyed by Robinson to Sarah Richards, on the 5th of Jan. 1792, was paid or advanced by Jemima Wilkinson. 2d. Whether the whole or any part of those lands passed by that deed. 3d. Whether the will of Sarah Richards had been altered since its execution. 4th. Whether the defendants were bona fide purchasers without notice of the alleged trust. The bill was accordingly amended, and the feigned issue prepared and noticed for trial at the Ontario circuit, in June, 1817. And at the same circuit, an action of ejectment was also noticed for trial, brought upon the de-

mise of the said Enoch Malin and Eliza his wife, against the said Rachel Malin, in which the validity of the will of Sarah Richards and its construction, and the question whether it had been fraudulently altered after the death of the testatrix, were directly presented and involved. The jury in that cause found a verdict for the plaintiffs, *and that the will had been altered by some interested person.*

The complainant, Rachel Malin, then put off the trial of the feigned issue, upon an affidavit of the absence of a material witness. *Enoch Malin and Eliza his wife* had both died previous to the trial of the ejectment suit, leaving two sons, David H. and Avery Malin. In August term, 1817, several actions of ejectment were commenced upon the demise of David H. and Avery Malin, and Elisha Williams, against the several occupants of the lots in township number seven. The tenants severally appeared, and then, on the 20th of May, 1818, filed their bill, with Jemima Wilkinson and Rachel Malin, as complainants, against the said David H. and Avery Malin, and Elisha Williams. This bill alleges, that in addition to the lots purchased by Jemima Wilkinson, through Eliza Richards, her trustee, from Benedict Robinson, on the 5th January, 1792, as set forth in the original bill, she also, through the same trustee, on the 2d day of May, 1793, purchased of one Thomas Hathaway the south half of lots No. 22 and 27, and the north part of lot No. 21 and 28, in the said township No. 7; that the entire consideration for the last mentioned purchase moved from the said Jemima Wilkinson, though the conveyance was made to the said Eliza Richards, without any trust being expressed in it. The bill also alleges a similar purchase from the said Thomas Hathaway of lot No. 47, on the 1st day of June, 1793, the consideration being paid by the said Jemima, though the deed was given to Sarah Richards. Also, a conveyance from William Carter to Rachel Malin, as executrix of Sarah Richards, of lots No. 50, 51 and 52, in said township, bearing date the 14th day of July, 1795. The deed recites, that the consideration money, $124, had been paid by Sarah Richards to Benedict Robinson; and the bill avers the said consideration money was the money of Jemima Wil-

kinson, and was paid by Sarah Richards, as her trustee, and to and for her use. The bill also alleges, that on the said 14th day of July, 1795, the said William Carter, in consideration of $140, received by Benedict Robinson, from one Asa Richards, conveyed to Rachel Malin, (executrix of Sarah Richards, who was the executrix of the said Asa Richards,) lots No. 45 and 46 ; and on the 14th of August of the same year, in consideration of $350, money of the said Jemima, paid to the said William Carter by Rachel Malin, the said William did release and convey to her all his interest in all the lots which had been purchased by the said Jemima as aforesaid, through her trustees, Sarah Richards and Rachel Malin, including in the whole 4160 acres. The bill states that Carter, in June and August, 1795, purchased from Benedict Robin- and Thomas Hathaway, who were then the proprietors, as tenants in common, of township No. 7, the greater portion of their interest in said township; and that the conveyances made by Carter were made for the purpose of perfecting the title to the lots granted by Robinson and Hathaway individually, to the trustees of Jemima—there having at that time been no partition between them.

The complainants then state the filing of the original bill, and the proceedings upon it, the awarding of a feigned issue, and the trial of the question as to the alteration of the will of Sarah Richards in the action of ejectment, and offer to abide by the decision of the supreme court in that cause, upon the subject of said will ; though they insist that the will cannot be material, or have any bearing upon the title to the lands in question, as they claim nothing under it, except as a declaration of trust and part execution thereof, in transferring the same to Rachel Malin, the trustee named by Jemima Wilkinson, as the successor of Sarah Richards in said trust ; and they pray that the order of November, 1816, directing a feigned issue, may be set aside, or at least revised and modified ; and they also pray an injunction against the defendants, commanding them to desist from further prosecuting as well the said suit in ejectment, in which a verdict was found, and case made and submitted to the supreme court, as the

said other suits in ejectment, more recently commenced, and not yet brought to trial. .

To this bill, the infant defendants put in a formal answer by their guardian, and Elisha Williams, the other defendant, filed a separate answer, denying substantially all the material allegations of the bill. In this stage of the cause, further testimony was taken. Jemima Wilkinson having died, a bill of supplement and revivor was filed by Rachel Malin and Margaret Malin, together with the other and former complainants, alleging the death of the said Jemima, and that she had left a will, by which she had devised the lands and tenements in question to Rachel and Marget Malin, two of the complainants, in fee, in trust for the maintenance and support of the poor of the society of the Universal Friends. To this bill, answers were also filed, and the cause was put at issue, and came on to a hearing before the late chancellor Kent, at the June term, 1823, upon the pleadings and proofs, including, by the agreement of the solicitors, the testimony taken in the first cause, wherein Rachel Malin alone was complainant; and on the 11th of July, 1823, the chancellor made a final decree, by which he adjudged that *Sarah Richards* was, at the time of her death, seized in fee in trust for Jemima Wilkinson, of the lands contained in lots Nos. 21, 22, 23, 26, 27 and 28, in township No. 7, and that the complainant, Rachel Malin, at the death of the said Sarah, became seized of the said lands, upon the like trust, as devisee under the will of the said Sarah Richards. It was further adjudged, that there was not sufficient proof that the said will had been altered, or if it had been, that the alteration was made with the privity or knowledge of the said Jemima Wilkinson, or the complainant, Rachel Malin. It was further adjudged, that the said Rachel Malin, since the death of the said Jemima, continued seized of the said lands, in trust for such person or persons; and for such purposes as the said Jemima may, by her last will, have directed and appointed, and in default thereof, for the lawful heirs of the said Jemima. And it was further declared and adjudged, that Rachel Malin was, in the life time of the said Jemima, seized of the lands in lots Nos. 45 and 46, in trust for

the said Jemima, and continued so seized in trust under her will, or for her lawful heirs; and it was declared that the will of Jemima Wilkinson was not sufficiently admitted or proved, to enable the court to determine whether the complainant, Margaret Malin, was a devisee under it or not. And it was further declared, that there was not the requisite parol proof, nor any sufficient manifestation in writing, that the said Sarah Richards held any other land in township No. 7, in trust for the said Jemima Wilkinson, except it be lots Nos. 24, 25, and 47, and that the complainant, Rachel Malin, did not appear to be entitled to those lots as devisee under the will of Sarah Richards, and that the complainant, Margaret Malin, had not shewn herself entitled thereto under the will of Jemima Wilkinson, so as to entitle her to the aid of the court in this suit, with respect to those lots. · The injunction which had been previously granted, was therefore continued and made perpetual in respect to lots Nos. 21, 22, 23, 26, 27, 28, 45, and 46. And it was further adjudged, that if any part of the lands purchased by Asahel Stone, junior, Elnathan Botsford and Truman Stone, as contained in the pleadings and proofs in the case, lie in either of said lots, that they were not bona fide purchasers thereof without notice of the trust; and it was decreed, that they should release the same to the said Rachel Malin. In September, 1823, the decree of chancellor Kent was, upon a rehearing, amended by chancellor Sanford, so as to permit the will of Jemima Wilkinson to be read, and to include in the injunction, lots Nos. 24, 25 and 47, in like manner as the other lots awarded to Rachel Malin. From these decrees, the defendants below brought their appeal to this court.

It will be perceived, that the principal question in this case is, whether *Sarah Richards*, in whom the legal title of the greater portion of the premises in question was vested, held the property in her own right, or in trust for Jemima Wilkinson. The decree affirms that she held it in trust. The general allegation, on the part of the complainants, is, that, according to the principles of the society of *Universal Friends*, of which *Jemima Wilkinson* was the head and founder, no estate or temporalities could be vested in her; that she, there-

fore, nominated Sarah Richards, then one of her followers and a member of said society, as her agent and trustee; and that, as such trustee, the premises in question were conveyed to her, though the consideration therefor was paid by the said Jemima Wilkinson.

The testimony in the case abundantly shows, that from the first establishment of the sect of which Jemima Wilkinson was the head, she was known among her followers by the name of the *Universal Friend*, and answered to and acknowledged that name alone; that it was a prevailing opinion among her people, that she could not hold land, or make written contracts by that name; that in contracts of that description, therefore, made for her benefit, the name of some one of her followers was also used; and that, during the two first years after the establishment of the society in the county of Ontario, (from 1791 to 1793,) Sarah Richards was, for the most part, her trustee or steward, and the written contracts of the Friend were made in her name; and that after her death, Rachel Malin became such trustee, and so continued when the testimony in the cause was taken. It seems also to be established, by a decided preponderance of testimony, that the land there held by Sarah Richards and Rachel Malin, was also considered by the followers of Jemima Wilkinson, as her's, and was called the "Friend's land;" that it was cultivated and improved, or otherwise disposed of, under her directions; and that the proceeds of said property were applied to the support of the Friend and her family, agreeably to her directions, and not to the personal benefit or emolument, either of Sarah Richards or Rachel Malin. The repeated declarations of Sarah Richards, that all the land held by her in the county of Ontario, belonged to the Friend, and was purchased and paid for with the Friend's property, and that she had no property, except a small house and farm in Watertown, in the state of Connecticut, and was dependent upon the Friend for the support of herself and her daughter, are also proved.

These declarations of the trustee are competent evidence for the purpose of establishing a resulting trust; for no principle is better settled, than that such a trust is not within the

statute of frauds, and may be proved by parol ; though all the cases admit that it is a dangerous species of evidence, and inculcate the necessity of requiring the payment of the money by the *cestui que trust*, to be clearly and satisfactorily established. A resulting trust is a trust raised by operation of law in favor of a person who advances the purchase money or consideration for an estate, the conveyance for which is taken in the name of another. The consideration expressed in the conveyance from Benedict Robinson to Sarah Richards, of the 5th of January, 1792, is £40 ; but the evidence shows, that a part of the land conveyed, was intended as a donation to the Friend. Robinson says, that before any partition of township No. 7 had been made between him and Hathaway, who owned it in common, he had agreed to make a present to Jemima Wilkinson of 1000 acres of land, in such part of said township as she might elect to have the same ; that she having elected to have it in the north-east part of the tract, he obtained a release from Hathaway of his interest in said portion of the township, and soon afterwards made the conveyance to Sarah Richards. He supposed, at the time, Sarah Richards acted as the agent of the said Jemima, and that the said conveyance was for her sole benefit, with the exception of 200 acres described in said deed. He does not know from whom the said Sarah obtained the money with which said land was purchased, except that about the time the money was paid, he heard Jemima and Rachel Malin say, that the money was obtained from the said Jemima.

The only direct and positive parol evidence, that the consideration of the conveyance from Robinson to Sarah Richards was paid by Jemima Wilkinson, is contained in the testimony of *Mary Bean* and *Richard Smith*. *Mary Bean* says that she has seen the Friend deliver money to Sarah Richards and Rachel Malin, to carry to Benedict Robinson, in part payment for said land, and that said Sarah and Rachel, and some man with them, went away with the money ; that when said Sarah and Rachel received the money, as aforesaid, from the Friend, *she said she was going to pay it to Benedict Robinson for the land ;* and when they returned home, Sarah observed, *that they had been to Benedict Robinson, and had paid the money to said Bene-*

*dict;* that she has often heard the said Sarah declare, that the lands purchased of Benedict Robinson were the Friend's lands, and that they *were paid for with the Friend's property.* She also testified, that she had seen a yoke of oxen, and, she believed, a cow or two, of the Friend's property, delivered by the Friend to some of her hired men, to be taken to said Benedict, in part payment for said land ; but she did not see said cattle delivered to said Benedict.

Richard Smith, in his examination taken on the 3d day of September, 1822, under the bill filed in 1818, testified that, during the year 1792, according to his best recollections as to the time, he was present when the said Jemima Wilkinson delivered to Sarah Richards $100, in silver, to pay to the said Benedict Robinson, as a part of the purchase money for land for a farm bought by said Sarah Richards, as trustee or agent for said Jemima ; that he, the witness, and the said Sarah went to the house of the said Robinson together, when the said Sarah went into the house ; and that the said Robinson had since admitted to the witness, that she at that time paid him the said sum of $100. He further testified, that some time during the same year, 1792, he sold to Sarah Richards, as agent or trustee for Jemima Wilkinson, two yoke of oxen for about the sum of $200, which oxen he delivered to Benedict Robinson, as a payment upon the land bought by Sarah Richards from him, and took a receipt accordingly. The testimony of this witness, if he were unimpeached, would be sufficient to establish a resulting trust in favor of Jemima Wilkinson, as to the lands conveyed by Benedict Robinson ; but he stands self-contradicted, in a manner which most essentially impairs, if it does not destroy the weight of his evidence. He was examined as a witness under the original bill in 1813, and he then testified that in 1793 he received two yoke of oxen from the Friend of the value of $100 or upwards, which he delivered by her direction to Benedict Robinson, in payment of lands ; *and that he never saw the said Sarah Richards receive money from the Friend or otherwise, which was applied in payment for land.* The discrepancy as to the time when the oxen were delivered, and their value, might not perhaps of itself destroy the credit of the witness.

ALBANY,
Dec. 1828.

Malin
v.
Malin.

He qualifies his testimony as to the time, by saying that it was, according to his best recollection, in 1792 ; and as to the value of the oxen, he says, on his first examination, that they were worth $100 or upwards, and on his last, that they were worth *about* $200. Here is no positive and irreconcilable contradiction. But not so as to the receipt and payment of the $100 in money. In 1813, he swore that he never saw Sarah Richards receive money from the Friend, which was applied in payment of land ; but in 1822, he swears that he not only saw the Friend deliver her $100, but it was in silver, and he himself went with her to Robinson's, where she paid it over to him. No circumstances are mentioned by which his recollections may, in the intervening time, have been refreshed. It is a bold, positive and unexplained contradiction, and it would be unsafe to give to the testimony of such a witness any weight, except so far as it may be confirmed by the other direct or circumstantial evidence in the case.

Mary Bean, however, is entirely unimpeached, and is supported as to a part of her testimony by Jonathan Davis and Jedediah Holmes, both of whom saw oxen and cows belonging to the Friend delivered to Robinson and Hathaway, in part payment of land purchased from them. They both also heard Sarah Richards say that the lands purchased from Robinson and Hathaway belonged to the Friend, and Holmes heard her say that they were *purchased with the Friend's property*. She declared, in her last sickness, to Moses Atwater, who drew her will and was her attending physician, and to Ruth Spencer, that she had no real estate, except a farm in Watertown, in the state of Connecticut, and that all the land she held in the county where she lived was the property of the Friend, and that she held it only in trust for her.

A mass of testimony was taken for the purpose of shewing that Sarah Richards was in truth poor ; that she brought little or no property with her, except a few personal chattels, when she came to this state, and that she never had the means of making on her own account, and from her own funds, a purchase like that in question ; and although the evidence upon this point is not entirely harmonious, the weight of testimony undoubtedly is, that she was poor, and

essentially dependant upon the Friend, with whom she ap‑
pears always to have lived.    When we add to this her own
repeated declarations to the same effect, the fact must be con‑
sidered established beyond all question.

.I consider it therefore satisfactorily proved, that all the writ‑
ten contracts of Jemima Wilkinson were made in the name
of an agent or trustee, nominated by her for that purpose ;
that Sarah Richards, when the contracts in question were
made, was such agent or trustee ; that the persons from
whom the lands were purchased understood and believed the
purchase was made for the benefit of Jemima Wilkinson ;
that they were always considered as her lands, and were so
called by all her family and followers ; that they were culti‑
vated, improved, or otherwise disposed of, as she directed ;
that their proceeds or profits were appropriated to her use, or
to the assistance and support of her indigent followers, agree‑
ably to her direction, and not to the individual benefit of Sa‑
rah Richards ; that Sarah Richards has repeatedly, nay, uni‑
formly declared, that she was but the agent or trustee of Je‑
mima Wilkinson in the purchase of these lands ; that at or
before the delivery of the deed by Benedict Robinson, the con‑
sideration of £40, expressed in the deed, was paid to him ;
that from the circumstances of Sarah Richards, as derived
from the proofs in the cause, and from her own declarations,
it is utterly improbable that that payment was made from her
own funds ; that Jemima Wilkinson (as appears from the tes‑
timony of Mary Bean) certainly advanced some money and
other property to a large amount towards the payment for
this land ; and that Sarah Richards, from the time of the
purchase down to her last sickness, invariably admitted that
the land was paid for with the Friend's property.

If the preceding summary is a fair deduction from the evi‑
dence, it appears to me to be a clear case of a resulting trust,
within the spirit of all the authorities.    It has been often said,
both by judges and by elementary writers, that proof of the
declarations or confessions of parties, is the most unsatisfactory
species of evidence, on account of the facility with which it
may be fabricated, and the impossibility of contradicting it,
and because the slightest mistake or failure of recollection

may totally alter the effect of the declaration. This observation was applied by the master of the rolls to the declarations of a trustee in the case of *Lench* v. *Lench,* (10 *Vesey,* 518.) But it was admitted, that where there were corroborating circumstances, the character of the evidence would be changed. In the case now under consideration, all the circumstances tend to corroborate and confirm the repeated admissions of Sarah Richards, that she was but the trustee of the Friend, and that the land in question was paid for with the Friend's property. If these declarations, thus corroborated, are to be taken as true, then the $100 paid to Benedict Robinson, when the original contract was made, which was before the deed was executed, as well as the $67, paid on the 10th January, five days after the deed bears date, were advanced by Jemima Wilkinson; and it is to be considered as one transaction, and the payment as having been made when the deed was delivered. At what time the money and cattle, spoken of by other witnesses, were sent by Jemima Wilkinson to Robinson, does not appear. None of them specify the time, except Richard Smith, whose testimony, for the reasons already stated, is to be disregarded.

But it is said, that ten or twelve hundred acres of the land were a gift, and that as to that portion, there can be no resulting trust, because it can arise only upon a valuable consideration. Admitting it to have been a gift, it is clearly shown to have been made and intended for the benefit of Jemima Wilkinson; and the valuable consideration expressed in the deed, and which was paid by her, must be considered as applying to all the premises described in it, as supporting the whole trust.

But admitting the view which I have hitherto taken of the case to be erroneous, and that the complainants' claim cannot be supported on the ground of a resulting trust, let us next enquire, whether the trust is not sufficiently manifested and proved by writing, to entitle it to be sustained and enforced as a direct trust. The written evidence is contained in exhibits R, S and T. These documents were first disclosed in the bill filed in 1818, and it is there alleged that they had

been discovered since the filing of the original bill, in the fall of the year 1817. They all purport to be written or signed by Sarah Richards, and contain repeated and explicit admissions of the trust in favor of Jemima Wilkinson, in relation to all the lots. The only question, then, is as to their genuineness.

Exhibit R, which is spoken of in the case as the *blue book*, purports to be a register or memorandum book, kept by Sarah Richards, commencing on the 13th of March, 1790, at Worcester, in Pennsylvania, being the day Jemima Wilkinson left there to remove into this state, and continued down to October 24, 1793, less than two months before the death of Sarah Richards. Orpha Gates, Sarah Potter, Mary Bean, and Richard Smith all testify, that they were well acquainted with Sarah Richards, and have often seen her write; that they have examined the book, and they believe the whole of it to be in the proper hand of Sarah Richards. Mary Bean further testified, that she had often seen in the possession of Sarah Richards a book, the cover of which was similar to this, and which she believes to be the same, and that she had often seen the said Sarah write in said book.

On the other hand, Justus P. Spencer, Ruth Spencer, Almira Danforth, Anna Stone, Mary Kidder, Abraham Waggoner and John Townsend swear, that they were well acquainted with the hand writing of Ruth Spencer, formerly Ruth Pritchard, and that the whole of the said memorandum book, except the signature of Sarah Richards, is in the hand writing of Ruth Spencer, who was the wife of one of the witnesses, and the mother of two others. This preponderance of evidence probably must be deemed decisive upon this point; and when the nature of the entries is considered, it is extremely improbable that Sarah Richards would have employed Ruth Pritchard as her amanuensis to write them, while she only signed her name. As judges, therefore, deciding according to the weight of evidence as it is presented to us in the depositions of the witnesses, we are probably bound to disregard this memorandum book.

The exhibits S and T, however, were unquestionably written by Sarah Richards. In addition to the four witnesses

who testified in behalf of the complainants in relation to exhibit R, we have the testimony of Anna Stone and Abraham Waggoner, two of the appellant's witnesses, who both swear that said letters are both in the hand writing of Sarah Richards. Against this, we have the testimony of Almira Danforth, who believes the body of the letters is in the hand writing of Ruth Spencer, her mother, though the signatures are not; but she never saw Sarah Richards write. Mary Kidder, another witness of the appellants, also believes the letter marked T, to be in the hand writing of Ruth Spencer. As to the exhibit S, she cannot testify. She also was unacquainted with Sarah Richards' hand writing. That these witnesses were entirely mistaken is shown by the testimony of Justus P. Spencer, Ruth Spencer and John Townsend, all of whom were witnesses on behalf of the appellants, and all unite in saying, that the letters are not in the hand writing of Ruth Spencer. They were unacquainted with Sarah Richards' hand writing, and could not say by whom they were written. More satisfactory or conclusive evidence of the genuineness of an instrument, so far as it depends upon the proof of hand writing, can hardly be imagined; and it can scarcely be necessary to notice what was called upon the argument the extrinsic evidence of their having been fabricated. Both of these letters are addressed to Ruth Pritchard. The first bears date on the 12th of March, 1793, *at Jerusalem.* It acknowledged the receipt of a letter from Ruth Pritchard, and expresses a wish that she would make ready to come where the Friend is, *in this town.* It informs her that the Friend has land enough for all that will be faithful and true, and then proceeds thus: "Dear Ruth: I will inform thee that Benedict Robinson has given the Friend a deed of some land in the second seventh, in the Boston pre-emption, which deed contains five lots; and the Friend has made use of my name *to hold it in trust for her,* and now I hope the friend will have a home, and likewise for the poor friends."

The second letter bears date at *Jerusalem,* the 3d of June, 1793—it is as follows: "Dear Ruth, I take this opportunity to inform thee further about the situation of our earthly

concerns.  The Friend has also taken a deed of Thomas
Hathaway, containing land south of that which Robinson
deeded to me, to hold in trust for the Friend ; and this deed
is witnessed by William Carter and Abel Botsford.   I hope
we shall get together before long."

The circumstances relied upon to impeach the genuine-
ness of these letters are, that they are dated at Jerusalem,
and invite the person to whom they are addressed, to join the
Friend in that town ; whereas, it is said that the Friend did
not remove to Jerusalem until some time after the letters
bear date, and after the death of Sarah Richards.

The precise time of the Friend's removal is not disclosed in
the case ; but Richard Smith and Mary Bean both state that
it was after Sarah Richards' death.   But all the testimony
shews, that the Friend commenced clearing the land, and
making her preparations for a settlement there, immediately
after the purchase from Robinson, which was in January,
1792.   Mary Bean, the same witness, says, that the season
after the purchase, the summer of 1792, she was sent upon
the land where the Friend built her house, to look for some
men who were employed by the Friend in clearing the land ;
and that about a year and a half after the time, which would
bring it down to the fall of 1793, or the winter of 1794, the
Friend removed with her family from the gore upon said
land.   From the time of the purchase from Robinson, that
was considered the permanent home or settlement of the
Friend and her followers—that was the object of the pur-
chase ; and in March, 1793, when the arrangement for a re-
moval must have been in active and forward preparation, it
was not unnatural for Sarah Richards, in addressing an ab-
sent friend, with a view to induce her to join the Friend's
family, to speak of her residence as being where it was soon
and permanently to be, although at that moment she had not
actually removed to it.

If every correspondence were to be thus nicely scanned,
and every letter were to be condemned as a forgery, notwith-
standing positive proof of the hand writing of the author, in
which an inaccuracy of this decription could be detected, it

would be difficult, I apprehend, to establish the authenticity of any series of letters.*

It is also objected, as a suspicious circumstance against this letter, that it communicates to Ruth Pritchard the information of the purchase from Robinson, fourteen months after it was made.

Ruth Pritchard was examined as Ruth Spencer, under the original bill, in 1813. It appears that she came into this state with the Friend, and was a member of her society ; and that, at the time of her examination, she resided in the town of Benton. If the appellant had deemed it important to shew that Ruth Pritchard resided with the Friend in 1792, when the purchase from Robinson was made, and must have known of it, and in March and June, 1793, was a member of the same establishment with Sarah Richards, and from these facts to infer the improbability of these letters having been written to her, they had an ample opportunity for doing ; for the letters themselves are set forth in *hæc verba* in the bill filed in 1818, and the depositions under that bill were not taken until 1822. The appellants, therefore, were not surprised by their production and proof before the examiners. But I am not prepared to say, that proof of the facts to which I have alluded, would vary the case : they might be important where the evidence of the handwriting was slight or contradictory. These letters, therefore, I feel myself bound to consider as genuine, and they establish the trust decisively as to the lands purchased from Robinson in January, 1792, and from Hathaway in May, 1793. A declaration of trust need not be made at the time of the purchase ; it may be at any subsequent period. (3 *Vesey*, 696. 5 *Johns. Ch. R.* 12. 6 *Cowen*, 726.)

---

* Since my opinion was written, I discover, upon re-examining the case, that John Davis testifies, that the gore where the Friend first settled, was in *the then town of Jerusalem*, since altered to the town of *Benton*. He says, when he arrived in the county of Ontario, (which was about 21 years before his examination, which was in 1813, carrying it back to 1792,) the Friend resided in that part of *the then town of Jerusalem* which is now called Benton, about a mile from the Seneca lake ; that about two or three years thereafter, she removed on to No. 7, where she now resides.

The next inquiry is as to lots 45 and 46, known in the case as the *Asa Richards'* lots. The legal title to these lots, it will be recollected, was conveyed to Rachel Malin by William Carter, on the 14th of July, 1795. The consideration expressed in the deed, $140, was received by Benedict Robinson of one *Asa Richards.* Asa Richards, by his will, made on the 21st of April, 1792, devised and bequeathed all his estate, both real and personal, to *Sarah Richards,* and made her his executrix. Sarah Richards, by her will, made the 16th November, 1793, gave to Rachel Malin all the land that had or might arise from Asa Richards' estate. Benedict Robinson testifies, that he recollects to have received from Asa Richards a sum of money, about £56, for which he gave him a receipt, and engaged to convey him lands in township No. 7. The deed from William Carter to Rachel Malin, he believes, was in fulfilment of that contract, as Carter, to whom he had conveyed all his right and title to lands in that town, was bound to fulfil the contracts which he had made for the sale of lands therein. The consideration for these lots was therefore paid by *Asa Richards,* and all his right, title or interest in them passed to Sarah Richards under his will; and I find no legal evidence of their having been charged with any trust in favor of Jemima Wilkinson. The title of the complainants to these lots, therefore, must rest upon the will of Sarah Richards.

The terms of the will are clear and explicit. It gives *to Rachel Malin all the lands that have or may arise from Asa Richard's estate.* Asa Richards had a devisable interest in these lands, although he had only a contract for them; and so had Sarah Richards, although she had not actually received a deed. The *vendor* is, from the time of the contract, considered in equity only as a trustee for the *purchaser.* The estate is considered as the real property of the vendee, and may be sold, charged, or devised by him. (1 *Ves.* 437, 494. 7 *Ves.* 274. 1 *Ch. Cas.* 39. 3 *Salk.* 85. 10 *Ves.* 611, 614. 11 *Ves.* 544. 1 *Ch. Cas.* 93. 1 *Madd.* 364.)

But it is contended that the will of Sarah Richards has been fraudulently altered by the complainants, subsequent

to its publication, and that they therefore can take nothing under it. I shall content myself upon this branch of the case with stating the conclusion at which I have arrived, without detaining the court with an analysis of the evidence. After a careful consideration of the testimony, I consider it by no means as clearly established that the will has in fact been altered. Moses Atwater, who drew the will and saw it subscribed by the testatrix, swears that it is now in the same state as when it was executed by her. His testimony, when we consider the means of knowledge which he possessed upon the subject, ought to outweigh the testimony of a dozen witnesses who speak only from an inspection of the will as it now appears. But the fact that the will produced does not correspond with the record of it in the surrogate's office, may perhaps give a preponderance to the evidence in support of the alteration.

But admitting it to have been altered, the evidence is insufficient to charge the complainant with such alteration; and it has been judicially decided in the case of *Jackson, ex dem. Malin* v. *Malin,* (15 *Johns. R.* 293,) that the alteration did not change the effect or construction of the will, and an immaterial alteration in a deed, if made by a stranger, will not destroy it; Rachel Malin, therefore, took lots 45 and 46, under the will of Sarah Richards. She admits in her bill, that the devise to her was in trust for the Friend; she holds them therefore, subject to the will of Jemima Wilkinson.

The only remaining lot is No. 47. This lot was conveyed by Thomas Hathaway to Sarah Richards, on the 1st of June, 1793. Exhibit S speaks only of the conveyance from Hathaway of the 2d May, 1793, for the south 1-2 of Nos. 22 and 27, and the north 1-2 of Nos. 21 and 28; and if the memorandum book is rejected, there appears to be no written evidence of a trust in relation to this lot, and there is no parol evidence that the consideration was paid by Jemima Wilkinson, except the general admission of Sarah Richards that all the land held by her in the county of Ontario was paid for with the Friend's property. This is not sufficient to create a resulting trust, and it can have no effect in any

other way. As to this lot, therefore, the complainants have failed to establish a title.

The will of Jemima Wilkinson must be considered as having been either duly proved or admitted in the court below, because the decree of Chancellor Sanford, of the 2d September, 1823, alleges that the fact of the devise of the lands in question by Jemima Wilkinson to Rachel Malin and Margaret Malin, was not questioned or disputed between the parties, and neither the pleadings nor proofs on which his amended decree was founded, are now before the court to enable us to test its correctness.

The only remaining question is, whether the defendants or any of them were bona fide purchasers, without notice of the trust. Elnathan Botsford, junior, and Benajah Botsford purchased 400 acres of the north part of lot 25 from Enoch Malin and Eliza Malin, on the 26th August, 1799, and took a conveyance of that date, with full covenants for the same. The answer alleges, that before they purchased, they applied to Jemima Wilkinson and Rachel Malin, and apprised them of their intent to purchase; to which they made no objection, but consented to and approved of the same. This allegation in the answer is fully supported by the testimony of Elnathan Botsford, jun., Parmele Barnes, and Gilbert Hathaway. The first witness says, that sometime in the month of August, 1799, he was informed by his son Benajah Botsford, that he and Elnathan Botsford, jun. had purchased, or were about to purchase 400 acres of said land on the north part thereof, and desired the deponent to go to the said Jemima, as he, the said Benajah, was not on terms with her, and inquire if she had any claim to the said 400 acres, or had any objection to their purchasing the same; and that, according to said request, the deponent immediately called on said Jemima, and made the inquiries as requested, and received for answer from her, "that she had no claim to said 400 acres, and that she had no objection to the said Benajah and Elnathan Botsford purchasing the same; that she supposed Enoch would sell it, and she had rather that his (deponent's) family would buy it, and come and live on it, and be neighbors to her, than any body else." That 2 or 3 weeks

after the deed was given there was a rumor that Jemima claimed a part of said 400 acres; that he called upon her again to ascertain the fact, when she again disclaimed all title to it. Parmela Barnes was present at the conversation, and confirms it in every essential particular. Gilbert Hathaway heard similar declarations made by Jemima Wilkinson and Rachel Malin, in relation to said contemplated purchase by the Botsfords about the same time, although he does not state that they were made to Elnathan Botsford, sen. The only impeachment of either of these witnesses is contained in the testimony of Amy Gates. She swears that in 1817, she heard Elnathan Botsford, sen. declare that he had never testified that the Friend had given permission to his son to purchase his farm, and he did not know that any such licence had been given. It is extremely improbable that Botsford ever made such a declaration. He must have known that his examination, which was taken in 1813, was reduced to writing, and would show conclusively, that such declaration was false; but corroborated as he is by the other two witnesses, even if he made the declaration imputed to him, it would not materially affect the force of his testimony. It is conclusively shown, that notice of Jemima Wilkinson's claim was given to the other defendants, *Asa Ingraham* and *Asahel Stone*, jun. before they purchased. *Asahel Stone*, senior, the father of Asahel Stone, jun. swears, that before either Asa Ingraham, or his son purchased, and while such purchase was in contemplation, he, at the request of the Friend, and in her name, informed them that the land was the Friend's, and forbid them to make any purchase of said land, or have any thing to do with it. This witness is fully sustained by Richard Smith, Jonathan Davis and Jedediah Holmes. The latter witnesses speak of the notice as having been given to Elnathan Botsford, jun. as well as Stone and Ingraham, but upon looking at their testimony, it will be perceived that it was in 1805, six years after Botsford purchased, and two or three years certainly after he had actually entered into possession; it could not therefore affect him. Botsford is also shown to have paid a valuable consideration for the land

purchased by him. He was therefore a bona fide purchaser without notice, and must, on that ground, be protected.

I have thus, Mr. President, finished the examination of this complicated case, a case involving no difficult or even doubtful question of law, but embarrassed with a multitude of witnesses and a mass of contradictory testimony to an extent which I have seldom known before. It has been my object, by a diligent examination of all the evidence, to satisfy myself as to the general truth and justice of the case; and where, in the consideration of particular topics, I have found the evidence contradictory and equally balanced, I have suffered such general conviction to decide the scale. But I have sometimes found that what, as a judge, I felt myself bound to consider the legal weight of evidence, did not produce that *moral conviction which can alone impart confidence or satisfaction to legal conclusions.* I shall therefore feel no surprise, if other members of the court, who may have examined the case with equal diligence and equal or superior powers of discrimination, shall, on some of the points which it presents, have arrived at different conclusions.

The result of my opinion is, 1st. That as to the land conveyed to Sarah Richards by Benedict Robinson on the 5th of Jan. 1792, there is sufficient parol evidence of the consideration money having been paid by Jemima Wilkinson to raise a resulting trust in her favor. 2d. That admitting it is not a case of a resulting trust, then that a direct trust, not only in relation to those lands, but also as to the lands conveyed to Sarah Richards by Thomas Hathaway, on the 2d May, 1793, is established and proved by exhibits S and T. 3d. That there is no sufficient evidence of a trust in relation to lot 47. 4th. That as to lots 45 and 46, Rachel Malin is entitled to them under the will of Sarah Richards, and that as she admits by her bill, that she is the trustee of Jemima Wilkinson, she must hold for the trust declared in her will. 5th. That as to the 400 acres of lot No. 25, conveyed to Benajah Botsford and Elnathan Botsford, jun., they were bona fide purchasers without notice of the trust, and cannot be disturbed in their possession; that the decrees below, ordering a perpetual injunction, ought, therefore, to be affirmed, except

so far as it relates to lot 47 and 400 acres of lot No. 25, purchased by the Botsfords, in August, 1799.

SAVAGE, C. J. expressed his concurrence in the opinion pronounced by Mr. Justice SUTHERLAND.

OLIVER, Senator. In order to determine whether this case comes within the statute of frauds, we must examine whether there is a trust sufficiently manifested in writing under the hand of the party to be charged.

The bill charges that the following lots were vested in Sarah Richards, in trust for Jemima Wilkinson, &c. &c., viz. : 1st. Lots Nos. 23, 24, 25 and 26, and the north half of lots No. 22 and 27, by conveyance from Benedict Robinson, dated the 5th January, 1792. 2d. The south half of lots Nos. 22 and 27, and the north half of lots Nos. 21 and 28, by conveyance from Thomas Hathaway, dated in 1793. The first testimony introduced by the respondents to shew that the above mentioned lots were deeded to Sarah Richards in trust, and to prove the written manifestation of said trust, are a small memorandum book of Sarah Richards, and two letters from her to Ruth Pritchard, dated in 1793, all of which were before the chancellor when he pronounced his decree in 1823. The memorandum book purports to have been kept by Sarah Richards, and contains four or five entries, which are very important in relation to the question of the written manifestation of a trust in Sarah Richards for the benefit of Jemima Wilkinson. The entries in the memorandum book upon which the respondents principally rely, are those dated the 1st and 7th June, 1791, and the 2d and 19th July, 1791. The three following are those which are of the most importance in this cause :

*" 5th day of the 1st mo. 1792.*

" This day I received a deed of Benedict Robinson, to hold in trust for the Universal Friend, for which the Friend sent me with a hundred dollars in silver, and then sent two yoke of fat oxen to Phelps and Gorham, to make out the payment for the land, which he said would not be more than one shilling per acre, and the deed contains five lots, which makes sixteen hundred acres. (Signed) Sarah Richards."

" *2d of the 5th mo.* 1793.

" This day I received a deed from Thomas Hathaway, to hold in trust for the Friend, and the Friend has paid all the consideration money to Hathaway.   (Signed)  Sarah Richards."

" *1st of the 6th mo.* 1793.

" This day I have received another deed from Thomas Hathaway to hold in trust for the Universal Friend, bearing date the 1st of the sixth month, ninety-three, lot number 47, which the Friend purchased for Mary Bartleston, widow, and has paid the consideration money.  (Signed) Sarah Richards."

Orpha Gates, Sarah Potter, Mary Bean, and Richard Smith, all agree and testify, that, in their opinion, the memorandum book was written wholly by Sarah Richards.  On the other hand, Justus P. Spencer, the husband of Ruth Spencer, (formerly Ruth Pritchard,) Almira Danforth, and Anna Stone, testify to their knowledge of Ruth Spencer's hand writing, and that they believe the body of the memorandums to have been written by Ruth Spencer and the signatures by Sarah Richards.   John Townsend is of the opinion that the whole of the memorandum book is in the hand writing of Ruth Spencer.   Mary Kidder testifies to about the same, but not with so much confidence.   Notwithstanding the suggestions and ingenious argument of the learned counsel, which are calculated to raise in the minds of the court a suspicion that the memorandum book is spurious, and a base forgery, yet, when we take into account the situation of the witnesses, and the opportunity which they respectively have had of knowing the hand writing of Sarah Richards and Ruth Spencer, I think the weight of testimony is decidedly in favor of the authenticity of the memorandum book.   If the authenticity of the memorandum book is established, it proves the fact of Sarah Richards' connection with Jemima Wilkinson ; of her first settlement in Ontario county ; of her receiving the deeds for Jemima ; of the payments for the land being made by Jemima ; and that Sarah Richards held them in trust for Jemima.   Exhibits S and T are two letters from Sarah Richards, of March and June, 1793, in which she acknowledges, that both the deed from Robinson and that from

Hathaway, were given her in trust. The letters are not only proved by the witnesses before mentioned, but by Abraham Waggoner, who was called by the appellants, and go far in corroboration of the authenticity of the memorandum book, and to prove the trusteeship of Sarah Richards. It appears from the testimony and answer, that Sarah Richards came to Ontario as the agent of Jemima, who was the head of the society; and that, as such head, she had the general control of the lands in question; and that part of them were given to her, upon condition of her forming a settlement thereon; that sundry payments were made by Jemima; that, according to an acknowledged tenet of the society, Jemima's property was held in trust for her by others; that Sarah Richards, till her death, was a member of the family, and resided with Jemima; and that she, Sarah, had not the means of making any considerable purchase. The facts alone go far in proving the trusteeship of Sarah; but when they are taken in connection with the memorandum book and the letters, they are conclusive.

It was urged on the argument, that the deeds from Robinson and Hathaway being absolute, no trust could be raised without contravening the statute of frauds. But I am of a different opinion; for the statute itself excepts this case as one of a trust by implication of law, which can be proved by parol. But the trust being admitted in writing by the trustee, as in this case it is, takes the case out of the statute. In equity, it has never been thought material, whether the writing admitting the trust was prior or subsequent to the conveyance, for the reason that the statute is directed against oral evidence of trusts, and does not apply when there is written evidence.

Again; the statute excepts resulting trusts, or trusts by implication of law: as when A. pays the purchase money, and takes the deed in the name of B., the trust may be made out by parol, inasmuch as the payment of the money, and whose it is, generally rests in parol. So in case of confidences, such as purchases by agents, parol proof is admitted, in order that the statute may not operate as a mean of protecting instead of preventing frauds. For the same reason,

parol proof is admitted to show that a deed, absolute on its face, was given as security by way of mortgage.

The result of these views of the case, as to the lands conveyed by Robinson and Hathaway, is, that the evidence adduced is satisfactory, and sufficient to establish a declared trust in favor of Jemima Wilkinson, and by her will to the use of Rachel and Margaret, as her devisees, except as against the Botsfords. There is a fact stated in the testimony of Elnathan Botsford, which, if entitled to credit, ought to rebut any equity arising from such trust. He testifies, that in 1799, when his sons were about purchasing 400 acres of land off of the north part of the land deeded by Robinson, of Enoch Malin and Eliza, he called upon Jemima for the purpose of asking, whether she had any objections to his sons' purchasing the 400 acres, or whether she had any claim to that land ; and received for answer from her, that she had no claim to the said 400 acres of land, and that she had no objections to the said Benajah and Elnathan Botsford, jun., purchasing the same. P. Barnes and Gibert Hathaway testify to the same facts. They also testify, that subsequent to this time, the Botsfords settled upon the premises.

The answer which is responsive to the bill; states, that the 400 acres were conveyed to Botsfords in 1799 ; and Richard Smith testifies, that the Botsfords went into possession about the time last mentioned. It is manifest, then, from the above testimony, that the sons of Elnathan Botsford purchased and went into possession of the above mentioned 400 acres, upon the faith of Jemima's declaration that she had no interest therein. It is also proved, that the Botsfords have paid $1200 as the consideration money of the said 400 acres, and have made valuable improvements thereon. Equity surely requires, that the *cestui que trust* should not enforce or assert her claim, when, having been previously called upon and inquired of as to her claim, she denied having any. (2 *Johns. R.* 573. 1 *Johns. Ch. R.* 354. 5 *Johns. Ch. R.* 184.)

The second question is, have the respondents made out a right to the residue of the land in dispute, or to any part thereof.

The bill alleges, that in 1795, Benedict Robinson and Thomas Hathaway conveyed the whole of their unsold interest in the township, to William Carter, reserving 6510 acres, and subject to the fulfilment of Robinson's receipts given for land ; that in July, 1795, Carter conveyed lots Nos. 50, 51 and 52, to Rachel Malin, the consideration money having been received by Robinson of Sarah Richards, and on the same day conveyed to her, as executrix of Sarah Richards, lots 45 and 46, for the consideration of $140, paid by Asa Richards to Benedict Robinson, and in August, 1795, in consideration of $350, paid by Jemima, conveyed to Rachel Malin lots Nos. 21, 22, 23, 24, 25, 26, 27, 28, 45, 46, 47, 50, 51, and 52. It will be seen that this deed was executed by way of confirmation, and for the purpose of removing all such doubts, as to the title of the land, as might arise about the partition. It has also a conveyance to Rachel Malin of 50, 51 and 52, and the south half of 21 and 28. These last mentioned lots are claimed by Rachel Malin, under the deed from Carter to her ; but the decree appealed from is silent as to these lots, and therefore the appeal does not bring them in controversy.

Lots Nos. 45 and 46 present a different question from any yet discussed. It is proved by Benedict Robinson, that these lots were purchased of him by Asa Richards, who paid the purchase money, but received no deed. Asa Richards, having devised all his real and personal estate in fee to Sarah Richards, and appointed her sole executrix, died. Sarah Richards died before letters testamentary were taken out. Subsequent to her death, Richard Smith obtained letters, with the will annexed. In 1793, Sarah Richards made her will, appointing Rachel Malin her executrix, and shortly thereafter died, leaving Eliza Richards, (the mother of David and Avery,) her only child. By one clause in her will, she devises all the lands that have or may arise from Asa Richards' estate, to Rachel Malin. The conveyance from Carter for 45 and 46 to Rachel Malin, was in fulfilment of the contract made by Asa Richards with Robinson. The respondents contend, that the appellants' equity to these lots is denied and repelled by exhibit R, (the memorandum book already re-

ferred to,) which alleges that the receipts from Benedict Robinson to Asa Richards for land, were transferred by delivery to Jemima, "to make remittance for the care of all his sickness and funeral charges, to the amount of fifty pounds lawful money of the state of Connecticut ;" that this delivery passed the interest of Asa Richards out of him, and of course it was not devisable by him ; hence Rachel Malin received the conveyance for these lots, as she admits by the bill, in trust for Jemima's use. Again ; they contend that the conveyance of Rachel Malin, as executrix of Sarah Richards, could not defeat the interest of Jemima ; and Rachel Malin, being Jemima's trustee, as well as Sarah's executrix, must hold the interest of Jemima as trustee. If the facts were as Sarah has stated in her memorandum book, and Jemima had obtained possession of these receipts for 45 and 46, there can be no doubt but that the consideration was sufficient to support the transfer ; and therefore Rachel Malin holds these lots in trust for the use of Jemima, and this resulting trust is provable by parol. (1 *R. L.* 79, *sec.* 13. *Saunders on Uses*, 180, &c. 1 *Vesey, sen.* 92.)

But would this memorandum, as between Jemima and Asa, be sufficient to transfer the interest of Asa to Jemima ? it certainly would not. But in answer to this, it is said, this admission, coming from Sarah, her grand children cannot claim an interest in these lots through her, it being at the time against the interest of Sarah, their ancestor, to make the admission. But I think, that upon a close examination of the facts and proof in the case, it will appear very different from what is stated in Sarah's memorandum.

1. About the time this memorandum purports to have been made, Asa Richards died, leaving a will, and having in his possession receipts for lots 45 and 46, devised them to Sarah in fee, and in 1793, Sarah died, devising these same receipts by name to Rachel Malin, without words of perpetuity. This at least goes to rebut the idea that Jemima had the possession and delivery of the receipts.

2. Richard Smith, a witness on the part of the respondents, testifies, that he was the administrator of Sarah Richards, and that he did administer upon the estate of Asa Rich-

ards; that the debts and expenses of his last illness and funeral, with the expenses of settling the estate, amounted to about one hundred dollars; and that he found property sufficient to balance that amount, and that he found no real estate." This testimony casts a shade of suspicion over the memorandum, and shows that the equitable interest in these lots was not passed to Jemima by Asa Richards.

Entertaining these views of Jemima's claim to lots 45 and 46, we will examine the devise of Asa Richards to his sister Sarah, which is, " all his estate in fee, after the payment of his just debts and funeral charges." It is settled that such a devise would pass the premises. (3 *Salk.* 83. 10 *Vesey*, 613. 2 *Vern.* 679. 3 *Atk.* 254.)

The next question in relation to these lots (45 and 46) is, did they pass by the will of Sarah Richards to Rachel Malin, and if so, what estate did she take ? The testator, in the first instance, devises to her daughter Eliza, the mother of David and Avery, all the receipts she held for lands, or the avails of them. In the next clause, she devises specifically to Rachel Malin, " all the lands that have or may arise from Asa Richards' estate." The settled rule of construction is, that a specific devise to one person forms an exception to a general devise to another contained in a former clause of the will. (2 *Burr.* 920.) Lots 45 and 46, then, were devised to Rachel, and not to Eliza. There being no words of perpetuity in the devise to Rachel, she takes under it but a life estate, and the heirs at law of Eliza will take the remainder by descent. Therefore, a perpetual injunction ought not to have been granted, as the reversion will pass to the heirs of Eliza, who was the *cestui que trust.* The *cestui que trust* has the same power over the legal estate as the person having the legal estate. The court of chancery will protect that interest. (2 *Ch. Cases*, 63, 78. 1 *Brown's Ch. Cases*, 72. *Ambler*, 518. 1 *Madd. Chan.* 362, 3.)

It was said on the argument, that the will of Sarah Richards was void by a fraudulent alteration. This objection cannot avail the appellants, as it is not proved to have been made or procured by Jemima or either of the respondents. Besides, the alteration is in a part immaterial, and therefore un-

availing. (15 *Johns. R.* 293.) But if the will was set aside, it would not benefit the heirs of Sarah Richards; for if she was a mere trustee under the deeds of Robinson and Hathaway, the descent to her heirs would be subject to the trust, and the respondents, as devisees of Jemima, claim to have the trust executed. (*Saunders on Uses,* 192. 1 *Equity Abr.* 384. 2 *P. Wms.* 200, 201. 2 *Atk.* 119. 2 *Johns. Ch. R.* 441. 4 *Johns. Ch. R.* 136. *Ambler,* 513.)

The most satisfactory opinion which I have been able to form in this case, embarrassed as it is with complicated questions both of fact and law, is, that Raceel Malin and Margaret Malin, as devisees of Jemima, are entitled in fee to all the lands deeded by Benedict Robinson and Thomas Hathaway to Sarah Richards, excepting thereout that part of those lands which were purchased by the Botsfords of Enoch Malin and Eliza Malin, and that the Botsfords are entitled to the 400 acres last mentioned ; and thus Rachel Malin has a life estate in lots 45 and 46, with remainder in fee to the heirs at law of Eliza, the daughter of Sarah Richards.

STEBBINS, Senator. The appellants claim title to the premises in controversy under Sarah Richards, in whom the legal title to part was vested at the time of her death, and, as they insist, the equitable title to the residue. The respondents insist, that whatever legal estate was vested in Sarah Richards, was in trust for Jemima Wilkinson, and that Jemima was the real equitable owner of the whole premises ; and the respondent, Rachel Malin, claiming to be successor of Sarah Richards, as trustee, filed her bill in the court of chancery in 1811, to establish the trust.

Preparatory to a decree in that cause, the court awarded an issue to ascertain certain facts, and, among others, whether the will of Sarah Richards had been altered after her death.

Before the trial of this issue, that fact having been found in favor of the appellants, in an ejectment suit between some of the parties, the appellants commenced several more actions of ejectment against the tenants in possession, and the respondents filed the bill now before the court, to restrain the proceedings of the appellants at law, on the ground of equita-

ble title set up in the bill, and to have that title declared and established.

The question, then, presented to the court of chancery, decided affirmatively there, and brought here for review, is, whether the respondents have established the title set up in their bill, to the whole or any part of the premises in question, so as to enable them to demand of the court a recognition of such title, and an exercise of its authority to compel a release from the appellants.

Township No. 7, in the second range of Phelps' and Gorham's purchase, was sold and conveyed to Benedict Robinson and Thomas Hathaway, and Benedict Robinson, on the 5th of January, 1792, conveyed, for the nominal consideration of £40, to Sarah Richards, lots Nos. 23, 24, 25, 26, and the north halves of 22 and 27, described as containing 1400 acres. At the same time, an agreement appears to have been executed between Robinson and Sarah Richards, reciting the conveyance, and that 1200 acres of the land was made a present, and providing that the residue should be paid for at the average prices at which the township should be appraised, acknowledging the receipt of the $100 in part thereof, if that sum should pay for more land than was conveyed, then the addition was to be made to the tract.

Sarah Richards died in December, 1793, leaving a will, which, it is urged, has been altered since her death ; but whether altered as alleged, or not, it appears to me no doubt can be entertained of her intention to devise to her daughter Eliza all the lands conveyed to her by Benedict Robinson, except 1000 acres to be taken off the south end, which she devises to Rachel Malin, without words of perpetuity. The appellants, David H. Malin and Avery Malin, are the heirs at law of Eliza Richards, who was the only child of Sarah Richards.

Without any formal partition, Robinson and Hathaway appear each to have been in the habit of conveying and contracting to convey, different lots in the township, until the interest of both became united in William Carter, by deeds from Robinson, in June, 1793, and from Hathaway, in August, 1795. Robinson testifies that Carter took the convey-

ance subject to the fulfilment of his outstanding contracts, and in several instances hereafter mentioned, it appears that Carter made conveyances to fulfil those contracts.

In August, 1795, Carter released the lots above mentioned, and all the lands in controversy in this suit, to the respondent, Rachel Malin. This conveyance is stated in the bill to have been made partly as confirmatory of the titles obtained from Robinson and Hathaway, and to extinguish any interest which might have passed to Carter by reason of there having been no partition between Robinson and Hathaway at the time of their conveyances. The bill alleges that only an undivided half passed by the deed of Robinson to Sarah Richards, and that consequently the respondent, Rachel Malin, is entitled to the other half under this deed from Carter.

*Without* speculating upon the effect of this deed, which it pretty clearly appears, so far as the lands conveyed by Robinson are concerned, was executed without any other consideration than that which moved between Robinson and his grantee, (for the whole consideration is but £140,) and which was intended to confirm the conveyance of Robinson, which purported to convey, and was considered at the time of its execution as conveying the entire property ; without raising the question upon such a state of facts, whether this confirmatory deed obtained by Rachel Malin, (who claimed to be the owner of the estate conveyed by Robinson,) would or would not enure to the benefit of the true owner, whoever it might turn out to be, on the ground of a trust resulting from the payment of the original purchase money, it might, perhaps, be sufficient to warrant the conclusion, that the entire property passed by the deed of Robinson to Sarah Richards, for the reasons, that both Hathaway and Robinson were in the habit of selling different portions of the township in severalty, with the knowledge of each other, and without objection, and that such sales were probably considered by them and acquiesced in, as parol partitions *pro tanto,* and the whole account between them adjusted at or before the conveyance to Carter.

But however this may be, the appellants have shewn by the testimony of Robinson, that a release was in fact executed of this part of the lands in question, from Hathaway to

him, previous to his conveyance to Sarah Richards, and for the purpose expressly of enabling him to convey the whole estate to her ; that this deed was afterwards cancelled by mistake in obliterating the grantor's name. In that shape, the deed is made an exhibit in the cause. The statement of Robinson is confirmed by the testimony of Thomas Hathaway the younger, and does not appear to be impeached, unless by the testimony of Garnsey, who swears to a conversation, in which Hathaway expressed some concern about an old quit-claim deed which had been cancelled in this way, and Robinson, he says, promised to burn it on his return home. The witness does not pretend to identify the deed in question as the one which was the subject of conversation between Hathaway and Robinson. The circumstance, also, that Hathaway conveyed other lands to Sarah Richards, adjoining these, is a strong one to shew that he acquiesced in the sale by Robinson.

I think, therefore, we may safely assume, that Benedict Robinson conveyed the entire estate in the lots above mentioned, by his deed to Sarah Richards of the 5th of January, 1792.

In regard to these lands, then, the respondent's claim must rest upon one or other of the following grounds : 1. That Sarah Richards was a trustee for Jemima Wilkinson, and that the trust is manifested by writing, within the provisions of the statute ; 2. If not, that she was such trustee in consequence of a trust resulting from the consideration of the conveyance ; 3. If neither of these positions are tenable, that they are entitled as devisees of Sarah Richards.

The written evidences of the trust consist of the small memorandum book of Sarah Richards, and two letters from her to Ruth Pritchard, both dated in 1793. The memorandum book was not produced upon the first hearing of the cause, and is alleged to have been found since in the possession of Ruth Spencer, (formerly Ruth Pritchard.) It contains 17 entries, all but four unimportant, purporting to be signed by Sarah Richards. Its appearance is not such as to inspire great confidence, and the testimony in relation to it is somewhat contradictory. Orpha Gates, Sarah Potter and

ALBANY,
Dec. 1828.

Malin
v.
Malin.

Richard Smith testify, that, in their opinion, it was written wholly by Sarah Richards. Justus P. Spencer, the husband, Ruth Spencer and Almira S. Danforth, the daughters of Ruth Spencer, and Anna Stone, testify to their knowledge of Ruth Spencer's hand writing, and that they believe the book to have been written by her, except the signatures. John Townsend testifies to his knowledge of Ruth Spencer's hand writing, and believes the whole book to have been written by her. Mary Kidder gives nearly the same opinion, with less confidence.

Most, if not all the witnesses who testify that the body of the entries is in the hand writing of Ruth Spencer, express their ignorance of the hand writing of Sarah Richards. The preponderance of this testimony undoubtedly is in favor of the supposition, that the entries were written by Ruth Spencer, and that the signatures are the hand writing of Sarah Richards; but if there is any accuracy in the judgment of the witnesses, it proves also a great similarity between the hand writing of these persons, and still leaves a shade over the authenticity of the book. There are many singular circumstances attending it, not very well calculated to dissipate our doubts. It is entitled "Sarah Richards' memorandum," and begins in March, 1790, and ends in Oct. 1793. It is singular that, during that period, only 17 events should have been recorded, especially when some are recorded which are very unimportant. It is singular, also, (if the fact is so,) that, in every instance, these entries should be in the hand writing of Ruth Spencer: that some of them should have been so, would not have been remarkable, considering that Sarah was often in bad health; but we should certainly expect to find some of them in her own hand writing. A book of this description is the last upon which persons ordinarily employ an amanuensis. One entry in the book bears date within two days of her letter to Ruth Pritchard of the 12th of March, 1793; another is dated within the same time of her second letter. It is singular, if these entries were made by Ruth Spencer, that Sarah should have taken the trouble to sign them. Indeed, few persons would have thought of attaching

their signatures to private memorandums in a book of this description.

If these entries were made for the purpose of being preserved as declarations of trust, it is singular that they should have been made in a book of this description, which certainly bears any other appearance than that of a muniment of title ; nor would they probably have been mingled with so much irrelevant matter. If they were made casually, without any particular reference to any effect they might have upon the title, those relating to the lands are couched in language singularly apt as legal instruments. In very few words they declare the trust, and also the only facts upon which the law raises a resulting trust.

It is singular that this book should have been found in the possession of Ruth Spencer, who was a witness upon the first hearing of the cause, and was examined upon the very subject to which these memorandums relate, and testified to an acknowledgment of the trust made by Sarah Richards during her last illness, without once mentioning that she possessed the written acknowledgment of Sarah to that effect.

The entry, which bears the same date. as the deed from Robinson, (5th 1 mo. 1792,) states the receipt of the deed to be held in trust for the Friend, " for which the Friend sent her with $100 in silver, and then sent two yoke of fat oxen to Phelps and Gorham, to make out the payment for the land," being " 1600 acres."

This memorandum, although bearing the same date as the deed, states the consideration paid, as being $100 in cash, and two yoke of oxen ; but the deed itself only acknowledges $100 consideration ; and, from the agreement accompanying it, which provides for a further payment if the land should overrun measure, we should certainly expect that the true consideration paid, would have been inserted in the deed and agreement. There seems to be some doubt when, in point of fact, these cattle were delivered, if delivered at all. Richard Smith, in his first examination, says he received of the Friend, and delivered two yoke at Canandaigua some time in 1793. In his second examination, he says, in 1792 he sold Sarah Richards two yoke of oxen, as trustee for the

Friend, and delivered them at Canandaigua to Robinson, in payment for this land. At any rate, if the oxen were not delivered before the 5th of January, 1792, as it would seem they could not have been, the entry is so far impeached as to shew that it was not made at the time it bears date. But again; the entry states the quantity of land conveyed, at 1600 acres; whereas, in the deed it is called 1400.

Nearly connected with this book, are the two letters from Sarah Richards to Ruth Pritchard. They also were found in possession of Ruth, subsequent to her first examination as a witness in the cause. The proof of their authenticity is, however, stronger than that in relation to the book. The first one, dated 12th March, 1793, is proved to be wholly in the hand writing of Sarah Richards, by the testimony of Sarah Potter, Richard Smith, Anna Stone, Mary Kidder and Abraham Waggoner; and the last, dated 3d June, by the same witnesses, except Anna Stone and Mary Kidder. Orpha Gates says, the signatures to both are Sarah Richards' hand writing. Mrs. Danforth thinks both letters, (except the signatures,) together with the superscriptions, to be the hand writing of her mother, Ruth Spencer. Justus P. Spencer and his daughter Ruth, are unable to say in whose hand writing they are, and Townsend thinks they are not Ruth Spencer's. It must be remembered that these witnesses were all examined twenty-eight years after the death of Sarah Richards, whose hand writing they were called to identify; and that the hand writing of females is generally much less distinctly marked than that of men of business. Under these circumstances, the intrinsic evidence which the papers may furnish is of more than ordinary importance.

The letter of the 12th of March, 1793, purporting to be written by Sarah Richards, is dated at Jerusalem, and directed to Ruth Pritchard, at Jerusalem. It informs her of the purchase made of Benedict Robinson, which took place more than a year previous, and requests her to come where the Friend is, in Jerusalem.

It appears by the testimony of Ruth Pritchard, afterwards Ruth Spencer, taken upon the first examination, that she was one of the followers of Jemima, and came with her from

Rhode-Island, and arrived with her in the county of Ontario, in the year 1790; that they at first settled on the gore on the west side of the Seneca lake, which is a short distance from the premises purchased of Robinson, and called Jerusalem. She testified upon that examination, that the Friend first cleared and improved the lands purchased of Robinson, and built the first house, which is stated in the memorandum book to have been in 1791.

Now it is singular, that when both parties were in the same town, members of the same society, and fellow emigrants, that Sarah should communicate by letter to Ruth, information of a conveyance, which had been made more than a year previous, of lands, with which it appears Ruth was well acquainted, and which she knew had been improved and built upon by the Friend two years previous, and which were the very object of their emigration. The scope of the letter seems to be, to desire Ruth to come and reside in Jerusalem, where the Friend was stated to be; and as an inducement, mentions that there is land enough there for all that would be faithful, for that Robinson had given a deed, &c.

By the testimony it appears, that the Friend did not remove from the gore to these lands until after the death of the writer of this letter, in the fall of 1793. Another interpretation of the letter may be, that the Friend and Sarah Richards were temporarily at Jerusalem, and wished Ruth to join them; but upon this supposition, it is difficult to account for the inducement held out of the large quantity of land, &c., if only a temporary visit was desired. The letter is evidently too cumbrous for a mere note of invitation.

The next letter is dated at Jerusalem, the 3d of June, 1793, and is from the same Sarah Richards to Ruth Pritchard, in which she first professes to give her some further information about the situation of earthly concerns, and then informs her that the Friend had taken a deed of Thomas Hathaway, for land south of that conveyed by Robinson, and which deed was witnessed by Carter and Botsford.

The memorandum book mentions two conveyances by Hathaway, one dated 2d May, and the other the 1st of June,

ALBANY,
Dec. 1828.

Malin
v.
Malin.

1793 ; the latter *conveying lot No.* 47. This last deed, which was executed by Hathaway to Sarah Richards, two days previous to her letter under consideration, cannot be the one referred to in the letter, for lot 47 does not lie south of the Robinson tract. The tract which is so situated, is stated in the bill to have been conveyed by Hathaway, on the 2d of May, 1793, and this deed is stated, in the will of Sarah Richards, to have been witnessed by Carter and Botsford. It is this deed, then, to which the letter refers, and it is singular, that in giving information of the situation of earthly concerns, she should mention the deed given a month previous so particularly as to name the witnesses, and entirely omit the one given only two days before writing the letter.

These are some of the principal circumstances attending the written evidences of the trust, and appearing upon the face of the papers, which, in my judgment, are calculated to cast a degree of suspicion over their authenticity, as genuine documents of the character which they purport to bear, and which may fairly be thrown into the scale, in opposition to the proof by which they come recommended.

In this stage of the examination, it appears to me we may, with propriety, put the question, whether the decree appealed from is correct, provided the former decree was considered to be so.

The leading question in the cause is, whether Sarah Richards held the lands in controversy as the trustee of Jemima Wilkinson. Upon the first hearing, the respondents rested upon the parol evidence, to establish a resulting trust ; and the court not being satisfied upon the question of fact, directed an issue, to find by whom the consideration money was paid.

The only additional evidence adduced upon the second hearing, in relation to the question of trust, and, I believe, of any description, (except the second account of the two yoke of oxen, by Richard Smith, above mentioned,) consists of the memorandum book and the two letters before mentioned ; and upon this additional proof, the court declares itself satisfied of the trust, and decrees accordingly. It would seem, therefore, that the point decided was, that these doc-

uments furnished satisfactory evidence of a trust, not of the description relied upon at the first hearing, but of a trust manifested by writing, in pursuance of the statute.

If these papers are genuine, and are, in reality, what they purport to be, it cannot be denied, that they amount to a sufficient declaration of trust, under the statute, as to the lands therein mentioned; and if so, the question of fact in relation to a resulting trust, which had been before litigated in the cause, became immaterial, and it was unnecessary to have the finding of the jury upon it.

But if, on the other hand, these papers did not come before the court in such a shape, or so supported as to entitle them to credit as a declaration of trust, it appears to me they could have no influence upon the questions of fact, upon which a resulting trust was to be established. If they are good for any thing, they must be good for the whole. Are they then entitled to credit, as declarations of the trust upon which Sarah Richards held these lands? The considerations before alluded to, induce me to hesitate, and adopt the opinion of chancellor Kent in *Steere* v. *Steere*, (5 *Johns. Ch. R.* 20,) that the plaintiffs have not made out a trust sufficiently clear and certain to enable the court to act upon it, and take the case out of the statute of frauds.

If the decree proceeds upon the basis of a resulting trust, then if the remarks in relation to these documents are just, it rests upon precisely the same and no other evidence than such as was before the court upon the first hearing, and was then considered unsatisfactory.

The decree does not inform us whether the trust was considered as *resulting* or *declared*, and we have no opinion of the court to guide us as to the view taken of the different questions agitated, or whether the last decree was considered as an alteration of the opinion expressed by the first, as upon a re-hearing and further examination is frequently done.

It becomes necessary, then, to examine the other questions in the cause, for the purpose of determining either the rights of the parties, or whether the evidence is such as to enable the court to determine those rights, without the aid of a

verdict at law, upon some of the controverted questions of fact.

The next question, then, in relation to the lands conveyed by Robinson, is, whether Sarah Richards held them upon a *trust resulting to Jemima Wilkinson,* in consequence of the consideration of the purchase having moved from her.

The memorandum executed cotemporaneously with the deed, recites, that 1200 acres of the land was made a present. Robinson, in his letter of 1789, proffers a quantity of land as a present to Jemima, and testifies on his examination, that previous to the execution of the deed, he had agreed to make a present to Jemima of 1000 acres of land, and had received of Sarah Richards $100. for which he had given her his receipt, engaging to convey lands to her in the township to that amount, and that in pursuance of this engagement, he executed the deed, supposing that Sarah received it for the benefit of Jemima, *except as to two hundred acres of the land.* Whether these 200 acres were a present to Sarah, or had been paid for by her, he does not mention. I should rather infer the former; for these 200 acres, with the 1000 to Jemima, *make up the 1200 acres mentioned in the agreement,* and the $100 paid by Sarah, is, by the agreement, made applicable to the payment for the excess of land over the 1200 acres. At all events, I think the testimony shews very clearly, that 1000 acres of the land conveyed by Robinson to Sarah Richards, were intended for the benefit of Jemima Wilkinson, and that her representatives are entitled to it, unless precluded by operation of the statute of frauds. This supposition is confirmed by the devise of these 1000 acres by Sarah Richards to Rachel Malin. The objection, however, to the claim of Jemima, on the ground of a resulting trust, is, that here was no consideration paid by her, and that the payment of consideration is essential to create such a trust. I think it would be conceding too much to admit that this conveyance as to the 1000 acres was entirely gratuitous. Robinson was formerly a member of the society of which Jemima was the head. At least, he says he attended her preaching, and as early as '89, and before he had obtained his title from Phelps and Gorham, in his letter to Sarah Richards, he speaks of

giving a quantity of land in the township to Jemima, and of her forming a settlement there. George Brown testifies, that in 1792, in exploring the township with Robinson, Sarah and Jemima, Jemima asked Robinson how much land he intended to give her and Sarah if they would remove into the town; to which he answered, 1000 acres. Gilbert Hathaway speaks of a similar conversation between Robinson and Sarah, and that he engaged to give her some land on condition she would remove on to it, and make the first settlement. Other witnesses speak of similar conversations, and I think the testimony is sufficient to shew that the removal to, and establishment of the sect of Jemima in the town, was an inducement (if not the only one) with Robinson, to convey the land, and that the conveyance of the land was the inducement for the removal which operated upon Jemima. Why, then, is not this a sufficient and valid consideration moving from Jemima to Robinson? I do not perceive that the case furnishes us with any reason for supposing that the conveyance of these 1000 acres was made by Robinson from any other motive than that of interest—certainly none for excluding the supposition of such a motive. It is not like the cases of advancement by a parent or relative; and when we consider the state of the country at the time of the conveyance, we can very readily imagine, that a man who held a township of wild land, and wished to promote its settlement, might, from mere motives of pecuniary interest, find it an object to dispose of a quantity to a person who would commence the settlement, and who would be likely to induce others to purchase and settle. And on the other hand, the commencement of such a settlement, at that period, must necessarily have involved pecuniary sacrifices and personal privations, nearly if not fully equivalent to the then value of the land. Such a consideration of benefit to one party, or injury to the other, would be sufficient to uphold an ordinary contract, and I cannot see why it may not be sufficient as the basis of a resulting trust.

The next inquiry is, as to the evidence of payments actually made to Robinson for this land, aside from the memorandum book and letters of Sarah Richards, which I lay out

of view upon this question of a resulting trust, for the reasons before mentioned. It is claimed by the respondents, that they were all made by Jemima, and that, of consequence, a trust results in her favor for the whole premises conveyed by Robinson. Richard Smith testifies, upon his first examination, that sometime in the year 1793, he received of the Friend two yoke of cattle, of the value of $100 or more, which were delivered in Canandaigua for the benefit of Robinson, and for which Robinson gave his receipt, to be applied towards land conveyed, or to be conveyed for the use of the Friend. Upon his second examination, after the discovery of the memorandum book of Sarah Richards, containing an entry of cattle paid to Robinson in 1792, he states, that some time in 1792, he sold to Sarah Richards, as agent for the Friend, two yoke of oxen for about $200, which he delivered to Robinson at Canandaigua, in payment for lands purchased by her of him, as agent for the Friend. He also states, that in the same year, he was present when Jemima delivered to Sarah Richards $100 in silver to pay to Robinson, and that Sarah went with him to Robinson's house to pay it over, but that he did not go in. On his first examination, he stated, that he never saw Sarah Richards receive money from the Friend, or otherwise, which was applied in payment for land.

Jonathan Davis testifies, that he saw Sarah Richards turn out a yoke of bulls, as the property of the Friend, to Robinson, in part pay for land purchased of him. He does not mention at what time this took place.

Jedediah Holmes testifies, that he saw Jemima herself deliver to Robinson and *Hathaway* four or six oxen and some cows, being her property, and in part payment for land purchased of them; but at what time, he does not state.

Mary Bean testifies, that she has seen the Friend deliver money to Sarah Richards and Rachel Malin to carry to Robinson, in payment for land, and that they went away for that purpose, with a man whom she does not remember; that she has seen a yoke of oxen, and thinks a cow or two, delivered by the Friend to some of her hired men, to be taken to Robinson for the same purpose. No date is given to these facts.

The witness also says, she has frequently heard Sarah Richards say, that the lands purchased of Robinson were paid for with the Friend's property. She further states, that Robinson had in his possession a mare which was raised by the Friend, and which, she understood, he received in payment for land.

Parmele Barnes testifies, that Sarah Richards purchased of one Brown a yoke of oxen, which she turned out to Robinson in part payment for lands in the 7th township.

These are all the witnesses that undertake to identify particular payments to Robinson ; and they were all, at the time of their examination, the followers of Jemima, with the exception of Barnes, who had withdrawn himself, but who states that he was not unfriendly to the society. Aside from any distrust of the witnesses arising from this circumstance, which might perhaps be thought uncharitable, it appears to me there is a looseness as to dates and circumstances, calculated materially to impair the force of their testimony.

Smith testifies, in his first examination, to a delivery of two yoke of oxen, of the value of $100, in 1792 ; and, in his second examination, to a delivery of two yoke in 1793, of the value of $200, without informing whether he speaks of the same transaction at those different times, or not ; and his testimony, in relation to the $100 in money, is little less than a flat contradiction.

With regard to the $100 in money, which was the consideration expressed in the deed, we have no evidence, unless it is to be presumed that he speaks of that money, and that that is the same of which Mary Bean speaks ; but she does not pretend to state the amount.

Again ; we have no means of knowing whether or not the oxen spoken of by Holmes, Barnes and Mary Bean, are the same as those mentioned by Smith and by each other, or are all separate and distinct transactions. Of the $67 endorsed on the agreement by Robinson, we have no evidence whatever to shew whose money or property it was, except the general declaration of Sarah Richards to Mary Bean, that the lands purchased of Robinson were paid for with the property of the Friend.

In addition to the evidence of payment above mentioned, there is a mass of testimony, consisting of the declarations of Sarah Richards, that she held these lands in trust for Jemima.

Inasmuch as the statute prohibits the enforcement of a trust, unless it is evidenced by writing, or results by operation of law, it would seem to be going a great length, to admit the parol declarations of a party to establish a fact from which a trust results; as, for instance, the payment of the purchase money by a person not a party to the deed; and chancellor Kent, in one case, remarked, that if the point were *res integra*, he should be inclined to agree with Sir Thomas Clerck, in *Lewe* v. *Dighton*, that such evidence is too dangerous in its consequence; but the objection comes too late, as the rule appears to be well established. But to admit the parol declarations of the grantee, that he holds the lands in trust for another, as evidence of the fact that such person paid the purchase money, and thereby to establish a resulting trust, it appears to me, is a total repeal of the statute. Every parol declaration of trust, which is declared invalid by statute, is, by this means, rendered valid as evidence of a resulting trust, which is saved by the statute.

However strong, therefore, might be the declarations of Sarah Richards upon this point, or however satisfactorily proved, I should be unwilling to regard them as evidence of the fact that the purchase money was paid by Jemima Wilkinson. I have found no case where the bare parol declaration of trust by a party, has been relied upon as evidence of a resulting trust, although in many, the declarations of the party have been admitted, even after his death, as to the fact of who paid the purchase money.

It may be useful, however, to examine this evidence hastily, and if I mistake not, it will be found not entirely uniform and convincing.

Richard Smith, Jonathan Davis, Jedediah Holmes, Mary Bean, Moses Atwater, Amos Garnsey, and Ruth Spencer, all testify to the declarations of Sarah Richards, that she held the lands in trust for the Friend—most of them say they heard her make those declarations frequently. Atwater tes-

tifies, that he wrote the will of Sarah Richards, and that upon that occasion she declared that the property which she held then was held in trust for the Friend; that she owned no land in her own right, but some land in Watertown; that she wished to give that to her daughter; and that it was necessary to make her will, to put the Friend's land into the hands of Rachel Malin for the use of the Friend. It appears, however, by the will, as written by this witness, in pursuance of these instructions, to have been the evident intention of the testatrix to give only 1000 acres of the land to Rachel Malin. The only comment which, in my judgment, this testimony of Atwater requires, is, that it was given at a time when the construction of the will contended for, was, that it first gave Rachel Malin all the lands deeded by Robinson except 1000 acres, and in the next clause gave her that 1000 acres also.

On the other hand, Gilbert Hathaway, George Brown, Thomas Hathaway, and Isaac Kinney testify, that Sarah called the land *her's*, and spoke of it as her own. Gilbert Hathaway, Isaac Kinney and Parmele Barnes say, they have heard her say she intended to have her farm on a certain part of the tract.

Gilbert Hathaway, Thomas Hathaway and Isaac Kinney testify, that they have heard Jemima speak of the lands in question as Sarah's land. Barnes thinks he has heard her admit to Sarah that she owned a part of the lands, but what part he cannot specify.

Elnathan Botsford testifies, that in 1799, when his sons were about purchasing 400 acres of the north part of the tract of Enoch Malin, he called upon Jemima for the purpose of asking whether she had any objections to the purchase, and was answered by her that she had not. Parmele Barnes and Gilbert Hathaway testify to her acknowledgments to that effect.

This is about the substance of the testimony gathered from the declarations of the parties; and, as I view it, considering the situation of the parties, and admitting it all to be entitled to credit, it amounts to but little upon the question of trust or no trust.

Jemima was the founder and head of a religious society of which Sarah was a member ; they lived together in the same family, on terms of perfect intimacy ; both gave directions as to the improvement of the land, and participated in its products, devoting themselves professedly, at least in a great degree, to other concerns than temporal ones ; and, under these circumstances, I apprehend, it would not be strange that Sarah should have declared that she held the whole property in trust, when, in fact, (as I think is proved,) she did hold 1000 acres which were intended for the benefit of Jemima, and might have meant no more, as respects the residue, than that it should be devoted to the interest of the religion of Jemima and her society.. So, too, that Jemima should have called the land Sarah's land, is not remarkably strange, since the legal title was in her, although the trust might have been ever so notorious.

Again ; that the land should have been generally considered Jemima's, I think is perfectly natural, since she was the known head of this most extraordinary society ; and that the land should have been improved in the manner it was, I think entirely consistent with the relative situation of Jemima and her most devoted friend, particularly in the situation in which it then was—an entire forest.   It is worthy of remark, that all the buildings erected for the use of Jemima and her society, are situated on the 1000 acres.

Such testimony as these loose declarations, to my mind, proves one thing more clearly than the trust which it is designed to establish—I mean, the danger of admitting it.

Sarah Richards, by her last will and testament, executed while on terms of friendship and intimacy, at least with Jemima, if not under her influence, at a time when she was leaving her only daughter to her care and protection, and was about to test the reality of her religion, has solemnly declared in that instrument, that all the lands conveyed to her by Benedict Robinson were her's, except 1000 acres ; and she disposes of them to her daughter.   I esteem this declaration of far greater weight than all the parol declarations that have been given in evidence upon the point ; for, under the circumstances attending the execution of this will, I should

sooner suspect her of doing more than equity, than of with-holding it from Jemima.

In support of the argument, that these lands were purchas-ed with the monies of Jemima, it is alleged that Sarah Rich-ards came into the country poor, and had not the means of making payment from her own funds. Many witnesses have been examined to this point, who state generally that she pos-sessed but little property, while others state that she had con-siderable. Again, some of the witnesses say Jemima brought but little property into the country, and others described her as bringing considerable stock, &c. The whole testimony upon the point, I think, leads to no satisfactory result. It does not appear that much property was brought by either of them, and the witnesses do not seem to possess much accurate knowledge as to whom it belonged.

Upon this point, therefore, as to all the lands conveyed by Robinson over and above the 1000 acres, after looking through the testimony as carefully as I have been able to do, I am compelled to say, that I am not satisfied that the purchase monies paid to Robinson for these lands, were the monies of Jemima Wilkinson, or that any particular definite portion of such monies were her's, and consequently that her represent-atives or devisees are not entitled to the same, in virtue of any resulting trust arising from such payment.

If, however, such a trust had been ever so satisfactorily es-tablished, there is a fact stated in the testimony of Elnathan Botsford, which, if entitled to credit, ought to rebut any equi-ty arising from such trust—it is the declaration of Jemima, before mentioned, made to him when he went to her before his sons purchased, at their request, to ascertain whether she claimed any interest in the north part of this tract, apprised her of their intention to purchase, and was informed by her, for answer, that she had no claim to those 400 acres, and no objections to their making the purchase. Parmele Barnes testifies, that he was present and heard this conversation, and Gilbert Hathaway testifies to a similar conversation at anoth-er time. These are the lands upon which I understand the Botsfords are now settled. The answer states them to have been conveyed to Botsfords in August, 1799—and probably

that fact was proved. I do not, however, discover the proo
in the case ; but Smith says he went into possession about
that time. If the testimony of Botsford, the father, therefore,
is to be believed, and the deed was taken by his sons upon the
faith of that declaration of Jemima, it appears to me a clear
case, where *equity required of the cestui que trust* to assert h
claim when called upon, and forbids the assertion of it after-
wards. (*2 Johns. R. 573. 1 Johns. Ch. R. 354. 5 Johns. Ch.
R. 184.*)

The purchases by Stone and Ingraham were subsequently
made, and the probability is, they had notice of the claim of
Jemima at the time of their purchases.

The third question as to the lands conveyed by Robinson
is, whether the respondents can claim under the will of Sa-
rah Richards, and to what extent ?

It was contended, when the question arose upon this will
in the supreme court, that the whole premises conveyed by
Robinson were intended, as the will now reads, to be devised
to Rachel Malin. That construction was rejected as inad-
missible, and its true construction decided to be the same now
as if the word " *also*" were inserted in the place where it is
said to have originally been. The same view of the question
was taken by the court of chancery ; and, it appears to me,
any other construction would' involve too great an absurdity to
be at all admissible. As I read it, whether with or without
the word also, it was the evident intention of the testator to
devise 1000 acres of the land conveyed by Robinson to Ra-
chel Malin, and the residue to her daughter Eliza.

That the will has been altered in the manner alleged, I
think is pretty clearly proved ; but by whom, is a question of
more difficulty, upon which we have no positive proof.

I do not understand it to be contended, that such an alter-
ation of the language of the instrument as does not alter the
construction, invalidates it, unless done by a person claiming
under it ; and if it be conceded that this will would be avoid-
ed if the alteration has been made by a party setting it up, I
do not think the testimony before us is sufficiently satisfacto-
ry to justify such an adjudication.

The question, then, is, what is the legal operation of this
will ? The estate is devised to Rachel Malin without words

of inheritance. She must, therefore, take an estate for life ; and it is contended, that as the devisor was but a trustee, the whole interest or estate passes without such words.

The case of *Foster* v. *Hale,* (3 *Vesey, jun.* 696,) establishes the doctrine, that since the statute of frauds, it is not necessary that a trust should be *created* by writing, but it is sufficient if *manifested* by writing, and that such written manifestation, although executed subsequent to the creation of the trust, renders it valid. Before the statute, the trust might be created and proved by parol, and the construction which seems to have been given to the statute is, that it is applicable only to the species of proof requisite to establish a trust, and that although the trust may be created by parol, as before the statute, yet that it cannot be enforced without written evidence. As applied to this case, it is, that Sarah Richards held the 1000 acres of land in trust for Jemima, but that for want of competent evidence, the trust was not such as could be enforced.

The operation of the statute appears to be very similar to that of the statute of limitations upon a debt, which, without destroying it, destroys the remedy to enforce it.

Regarding Sarah Richards, then, as the trustee of Jemima Wilkinson, in virtue of the gift of the 1000 acres by Benedict Robinson for her benefit, though not legally bound to execute the trust, it appears to me some very nice questions may arise as to the effect of her devise. Can a trustee carve out the estate by the creation of terms, life estates, and remainders, in his trusteeship, in the same manner as the absolute owner of the fee ? If not, and he attempts to carve, what is the effect of his devising a less estate than he possesses ? Does his whole estate pass, or is the whole grant void ? As he might have rendered the trust valid by acknowledging it in writing, can his devisee do the same ? Is the will in this case tantamount to a declaration of trust by Sarah Richards ?

The general language of the books is, that the estate of a trustee passes by devise or descent, subject to the trust, and I have found no case where the courts have declared the effect of an attempt to carve out of such an estate by devise.

From the examination which I have been able to give the subject, I should be unwilling to say, that Rachel Malin could take a fee under this will; but that notwithstanding the proof in relation to its alteration, she might take an estate for life in the 1000 acres.

If, however, I am correct, that as to these 1000 acres, a trust resulted in favor of Jemima Wilkinson on the ground of a consideration moving from her to Robinson, the operation of Sarah Richards' will upon this tract becomes immaterial, as Rachel Malin is the devisee of Jemima, and as such, entitled to the benefit of the resulting trust.

The result of these views of the case as to the lands conveyed by Benedict Robinson, is, that the documentary evidence adduced is not sufficient and satisfactory to establish a declared trust in favor of Jemima Wilkinson and her representatives; that the testimony in the cause is not sufficient and satisfactory to prove that Jemima Wilkinson paid the consideration for such lands, or any definite proportion of it, to Robinson, either in money or other property, and that therefore no trust resulted in her favor on that ground; but that in regard to 1000 acres of the south part of the tract, a consideration did move from her, equivalent to the payment of a pecuniary consideration, and as to that part, that a trust did result, of which Rachel Malin and Margaret Malin, as her devisees, are entitled to avail themselves, except as against the Botsfords, (in case the 1000 acres should cover any part of their purchase,) and that Rachel Malin would also be entitled, under the will of Sarah Richards, to a life estate at least in the 1000 acres, in case the devisor had been the absolute owner.

We come next to the tract situated south of and adjoining the tract conveyed by Robinson, consisting of the south half of lots 22 and 27, and the north half of 21 and 28, except a portion lying east of the creek. These premises are stated in the bill to have been conveyed by Thomas Hathaway to Sarah Richards, on the 2d May, 1793, and are described as extending south to the lands of Daniel Brown. The deed is not set out in the case, but the answer of the defendant Williams admits that he has seen the record of such a deed.

The appellants insist upon the cancelled deed of Hathaway to Robinson of the 5th of August, 1791, before remarked upon, as a subsisting and valid conveyance. This deed describes the premises conveyed as extending south to the lands of Daniel Brown, jun. If the south boundary mentioned in each of these conveyances is the same, then Hathaway conveyed nothing to Sarah Richards, having before released to Robinson, and the legal title passed to Rachel Malin by the subsequent deed of Carter. How this fact is precisely, the case does not enable us to determine, and as the point was not made upon the argument, I proceed to the other grounds upon which the respondents claim these premises, which are—1. On the ground of a resulting trust; 2. As devisees of Sarah Richards; 3. The 'undivided half under the deed from Carter.

The first point must stand upon the same footing as the same point does in relation to the lands conveyed by Robinson, except that the evidence of actual payments is almost exclusively confined to Robinson. Only one of the witnesses, I think, speaks of a payment of cattle to Robinson and Hathaway, and no one of any payment made to Hathaway alone. The devise of Sarah Richards is to Rachel Malin, of specific lands, without words of perpetuity, or other language importing an intention to devise a fee, and *a life estate, therefore, passes under it.*

With regard to the claim under Carter's deed of the undivided half, on the ground that no partition was made between Hathaway and Robinson, as before remarked, in my judgment, sufficient appears to authorize us to regard the different conveyances by each of them as partitions *pro tanto.* There being no trust established, then, the respondent, Rachel Malin, is entitled only to a life estate in these premises.

Lot No. 47 is stated in the bill to have been conveyed by Thomas Hathaway to Sarah Richards, on the 1st of June, 1793, and the conveyance is admitted by the answer. The memorandum of the exhibit attached to the respondent's case, states the conveyance to be to Robinson, probably by mistake in drawing or printing the case. This lot is not devised by Sarah Richards, and the claim of the respondents must rest

upon the ground of a resulting trust, or to a moiety under the deed from Carter. As both these points have been examined before, it is unnecessary to do more than to mention them in this place.

Lots Nos. 45 and 46, present entirely different questions. According to the testimony of Robinson, these lots were purchased of him by Asa Richards, who paid the consideration, but took no deed. Asa Richards died, having devised all his real and personal estate to Sarah Richards in fee. By one clause in the will of Sarah Richards, "all the lands that has or may arise from Asa Richards' estate," are devised to Rachel Malin. Rachel Malin afterwards took a deed from Carter in fulfilment of the contract made by Asa Richards with Robinson, which acknowledges the payment of the consideration for it by Asa Richards to Robinson.

The respondents allege, that the receipt which Robinson gave to Asa Richards for these lands, was sold and delivered by him in his lifetime, for valuable consideration, to Jemima Wilkinson, and that the equitable estate, therefore, vested in her, and did not pass to Sarah Richards under the general devise contained in the will of Asa Richards. The only evidence, I think, which the case furnishes of this fact, is an entry in the memorandum book of Sarah Richards, so often before mentioned. It is dated the 26th June, 1792, and states that Asa Richards died the 28th, (not mentioning the month.) Then follows another memorandum, stating that he came to the Friend's house sick, nearly two years before his death, and gave the Friend a receipt which he held from Robinson for land, &c. before his death, "to make remittance for the cure of all his sickness and funeral charges, to the amount of fifty pounds, lawful money of the state of Connecticut." A circumstance so extraordinary as that of a man's making provision for the payment of his funeral charges, by disposing of almost the whole of his estate, as we shall see it was, without any writing to attest the transfer, or any receipt for the debt which it was turned out to cancel, and by a man, too, who thought it necessary to make a will, devising both real and personal estate, when he had no real estate except his equitable title to these lands, in my judgment, requires stronger

proof than any that is afforded by the memorandum book, in which the record of it is found. But the testimony throws a still stronger shade of suspicion over it. Richard Smith, one of the respondents' witnesses, who was examined before this book was discovered, testifies that he administered upon the estate of Asa Richards; that he found no real estate; that the debts and expenses of his last illness and funeral, and expenses of administration, amounted to about $100; and he found property barely sufficient to balance that amount. I think no other inference can be drawn from this testimony than that he paid the expenses of the testator's sickness and funeral out of the personal estate; and that it appears to me that all pretence, that the equitable interest in this land was conveyed to Jemima by Asa Richards, in his life time, is not only not sufficiently proved, but contradicted by her own witness, and, to say the least, a willing one.

The devise by Asa Richards is of all his estate, both real and personal, to Sarah Richards, after payment of debts and funeral charges, and under such a devise, I take it to be well settled that the premises in question would pass. (3 *Salk.* 85. 10 *Vesey,* 613. 2 *Vern.* 679. 3 *Atk.* 254.)

The only remaining question, then, respecting these lots, is, whether they passed by the will of Sarah Richards to Rachel Malin, and what estate the devisee took. The testatrix first devises to her daughter Eliza, all the receipts that she held for land, or the avails of them, and in a subsequent clause, devises specifically to Rachel Malin, "all the lands that has or may arise from Asa Richards' estate." It appears to me to have been the manifest intention of the testatrix to give these premises to Rachel Malin, and that by the receipts mentioned in the former clause, were meant such as she held in her own name, and it appears she must have held sufficient to cover three lots at least, for that quantity was afterwards conveyed by Carter by deed, acknowledging the consideration to have been paid by her. But at any rate, upon the familiar principles of construction, a specific devise to one person, forms an exception to a general devise to another, contained in a previous clause of the will. (2 *Burr.* 920.) The devise of these lands is contained in the same clause of

the will as the other devises to Rachel Malin, and she of course takes a life estate.

Lots Nos. 50, 51 and 52 are also claimed by Rachel Malin under the deed to her from Carter, which acknowledges the consideration to have been paid by Sarah Richards to Robinson. The decree appealed from, however, is silent as to these lots, and it is therefore unnecessary to examine the title of the respondents.

The result of the most satisfactory opinion which I have been able to form upon this case, obscured as it is by complicated questions of fact and difficult questions of law, is, that Rachel Malin and Margaret Malin, the devisees of Jemima Wilkinson, are entitled in fee to one thousand acres off the south part of the tract conveyed by Benedict Robinson, but not to include, however, any part of the lands conveyed to the Botsfords, with the knowledge and assent of Jemima ; that Rachel Malin is entitled to a life estate, under the will of Sarah Richards, in lots Nos. 45 and 46, and also in that part of 21, 22, 27 and 28, conveyed by Hathaway to Sarah Richards, on the 2d of May, 1793 ; and that as to the residue of the lands claimed in the respondents' bill, being those claimed by the Botsfords, and the residue of the tract conveyed by Robinson, and also lots Nos. 47, 50, 51 and 52, the respondents have established no title.

Senators BENTON, CRARY, DAYAN, ELSWORTH, ENOS, McMICHAEL, SCHENCK, SMITH, THROOP, TYSEN, WARREN and WHEELER, also concurred in the opinion pronounced by Mr. Justice SUTHERLAND ; and Senators HAGER, LAKE, McCARTY, McMARTIN, TODD, WILKESON and WOODWARD, concurred in the opinion pronounced by Mr. Senator STEBBINS.

Whereupon, it was ordered and adjudged, that the decrees appealed from, ordering a perpetual injunction, be affirmed in all things, except so far as they relate to lots Nos. 45, 46 and 47, and 400 acres of land purchased by Benajah Botsford and Elnathan Botsford, jun., of Enoch Malin and Eliza, his wife ; that there is not sufficient evidence of a trust in favor of Jemima Wilkinson, in relation to lots Nos. 45 and 46,

but that Sarah Richards took an estate, in fee, in the same, without any trust under the will of Asa Richards, and that the complainant, Rachel Malin, is entitled to an estate for life in the said lots, under the will of Sarah Richards, and holds the same subject to the trust declared and appointed by the will of Jemima Wilkinson; that there is no evidence of any trust in relation to lot No. 47; and that the Botsfords were *bona fide* purchasers of the 400 acres, without notice of the trust in favor of Jemima Wilkinson. The decrees below, therefore, were reversed as to lot No. 47 and the 400 acres, and modified as to lots 45 and 46, without costs to be paid by either party to the other.